GERALD BRUNO, Appellant, v NEW YORK NEWS, INC., Also Known as NEW YORK DAILY NEWS COMPANY, Respondent.

Third Department, November 4, 1982

**APPEARANCES OF COUNSEL**

*Lee, LeForestier, Malone, Smith & Hanft (David R. Murphy* of counsel), for appellant.

*Whiteman, Osterman & Hanna* and *Patterson, Belknap, Webb & Tyler (Melvin H. Osterman, Jr., Richard D. Parsons, Marjorie T. Coleman* and *Gail H. Nichols* of counsel), for respondent.

**OPINION OF THE COURT**

LEVINE, J.

Plaintiff was the Director of the New York State Division of the Lottery from April to December, 1975. In early 1975, defendant New York News, Inc. (the News), through its reporters Federici and Poster, began an investigation of the operation of the lottery. From their investigation, the

reporters believed that they had uncovered irregularities in the conduct of the lottery, principally consisting of substantial overdistribution of tickets for its "Colossus Game" and large-scale inclusion of unsold tickets in the drawings, with the result that in many of the weekly drawings for the grand price of $250,000, none was awarded because the winning ticket was never purchased. Furthermore, unawarded prizes were not added to the following week's jackpot, thereby creating a large, unanticipated surplus. Plaintiff and members of his staff met with the reporters on October 7, 1975 to discuss these findings. At the meeting, plaintiff explained that the Colossus Game was designed to create a cumulative jackpot through the inclusion of unsold tickets in drawings, that eventually unawarded prizes would be added to later jackpots, and that the procedures employed were consistent with the published rules and regulations of the lottery, which were approved by the Legislature and predated plaintiff's appointment to his position. The reporters, however, remained unconvinced. One stated: "You're gypping the public, Bruno * * * I still say you're gypping the public, Bruno". This statement is the basis for plaintiff's first cause of action for slander. There then followed a series of 11 articles and an editorial in October, 1975 and an article the following March which comprise the subject matter of plaintiff's second through fourteenth causes of action for libel.

The articles begin by accusing the lottery of "gypping" and "systematically cheating" the public by issuing 4 to 6 million tickets, all of which participate in the weekly drawing despite sales of less than 3 million. This is stated to have been responsible for there having been no grand prize awarded in 17 of 38 weekly drawings and the creation of a $1,500,000 surplus which "by law should never have existed". Lottery officials are reported as having contemplated several acts of dubious legality, including transferring the whole surplus to the State treasury and "covering up" losses on one special drawing by using interest earned on undistributed installments of other prize money. However, it is stated, they were "warned off" by their lawyers. The editorial characterizes the practices described in the

initial articles as a "schemeroo" in which the public is "hoodwinked" by not being informed of the "dumping" of unsold tickets into the drawings, and states that the lottery lacks a "conscience" as well as able leadership. Subsequent articles report and describe various bumbling machinations to correct the practices revealed by the News. Thus, Governor Carey is stated to have ordered a purge of unsold tickets, and lottery officials to have announced both a final Colossus Game Halloween drawing to dispose of the surplus and a new type of game to eliminate participation of unsold tickets. Yet, the News asserts that its investigation showed that unsold tickets were still being used in drawings and that ultimately, in rushing to comply with the Governor's order, lottery officials caused a breakdown in the computer and the ultimate indefinite suspension of the lottery itself. The final article in March of 1976 asserts that the lottery deliberately withheld prize money and that its officials "tried to hide the scandal". The major specific critical references to plaintiff include: repetitious recitals that he defended the practices and insisted they were routine before his administration; that he replaced experienced staff with his own political followers; that he was involved in the contemplated but aborted "cover up" of losses on a special lottery drawing, and finally, in the last article published months after he resigned, that he would never be rehired when the lottery resumed — "even his old Democratic friends, including Carey, don't want him around".

In a previous appeal, we reversed Special Term's dismissal of the complaint for legal insufficiency (*Bruno v New York News,* 68 AD2d 987). Subsequently, after obtaining pretrial disclosure through interrogatories, the News successfully moved for summary judgment dismissing the entire action, and this appeal followed.

It is uncontested that whatever criticism of plaintiff can be read from the articles in question, all of it related to his status as a public official and to the performance of his official duties. Therefore, on this motion for summary judgment, in addition to having to present proof in evidentiary form sufficient to create a triable issue of fact concerning the defamatory character of the News' publications

and their falsity, plaintiff was also required to submit evidence sufficient to sustain his burden of establishing, with "convincing clarity", that the defamatory falsehoods were made with actual malice, i.e., the News' knowledge of their falsity or reckless disregard for the truth (*New York Times Co. v Sullivan,* 376 US 254, 279-280, 285-286; *Rinaldi v Holt, Rinehart & Winston,* 42 NY2d 369, 379, 385, cert den 434 US 969; *Orr v Lynch,* 60 AD2d 949, 950, affd 45 NY2d 903). Moreover, whether the words used are susceptible to the defamatory meaning ascribed to them is to be determined as a matter of law, by considering the publication as a whole and the context in which the words were used (*Rinaldi v Holt, Rinehart & Winston, supra,* p 382; *James v Gannett Co.,* 40 NY2d 415, 419; *Orr v Lynch, supra*).

Before applying these general principles, however, we must first resolve the issue of whether the News' attacks on the lottery itself, its operation, and "Lottery officials" may constitutionally give rise to liability as defamatory of plaintiff. In *New York Times Co. v Sullivan* (*supra*), the Supreme Court held that defamatory falsehoods concerning alleged civil rights deprivations by the Montgomery, Alabama, police could not, standing alone, be actionable on behalf of the plaintiff on the bare fact of his official position as police commissioner, because this would be tantamount to an award of damages for a libel on government itself (*New York Times Co. v Sullivan, supra,* pp 290-292). However, in *Rosenblatt v Baer* (383 US 75, 81-83), the court limited this holding in *New York Times* to instances where there was no extrinsic evidence linking the criticism of the governmental body to the official personally. Here, the evidence was sufficient to at least create a jury question as to whether the articles referred to plaintiff and were reasonably read as such. All but one of the articles were published daily in series between October 15, 1975 and October 25, 1975. In many, plaintiff was identified as the lottery's chief administrator and defender. Plaintiff's photograph was an inset to the "schemeroo" editorial. Additionally, plaintiff presented evidence consisting of excerpts from letters of dissatisfied lottery players in which he was identified as the "gyp" and "cheat" in the very same

language the News' articles applied to the lottery. Therefore, we think the link to plaintiff was sufficiently established to prevent dismissal of the action with respect to the News' charges against the lottery which did not specifically refer to him.

Even though the accusations of cheating, gypping, and being conscienceless may be read against plaintiff, examining them in the context in which they appear leads us to conclude that they are not actionable. Expressions of opinion are constitutionally privileged when accompanied in the articles by objective facts supporting them (*Gertz v Robert Welch, Inc.,* 418 US 323, 339-340; *Rinaldi v Holt, Rinehart & Winston, supra,* p 380). The supportive facts concerning the overdistribution of tickets, failure to award prizes, and unanticipated surplus are repeatedly included within the context of the accusatory articles and were literally true. Thus, labeling the lottery as a "gyp", and accusing it of "systematically cheating" the public and being without a conscience on the stated basis of those facts constitute nothing more than the kind of "rhetorical hyperbole" which was held immune in connection with the charge of "blackmail" in *Greenbelt Pub. Assn. v Bresler* (398 US 6, 10-11), of "corruption" in *Silsdorf v Levine* (85 AD2d 297, 300-301), and the characterization of the plaintiff as a "fellow traveler of fascism" in *Buckley v Littell* (539 F2d 882, 893, cert den 429 US 1062; see, also, *Orr v Lynch, supra*). This equally applies to the statements attributed to one of the reporters at the October 7 meeting set forth in plaintiff's first cause of action. Also falling within the opinion category are the accusations of plaintiff's use of lottery staff positions for political patronage (concededly plaintiff made significant replacements and additions to his staff) and the general charges of his incompetence and mismanagement (*Rinaldi v Holt, Rinehart & Winston, supra,* p 381). Nor was it actionable to portray plaintiff as contemplating fiscal manipulation of the Colossus operation, either by transferring its surplus to the State treasury or in order to "cover up" losses on one of its special drawings, until dissuaded by legal advisors. Clearly there was no accusation that plaintiff acted on his impulse; reporting that he contemplated wrongful activity is noth-

ing more than ascribing improper motives to him, which may not afford a basis of recovery by a public official (*Rinaldi v Holt, Rinehart & Winston, supra,* p 382).

Regarding other, more factual statements contained in the October series of releases by the News of which plaintiff complains, there was a failure to submit clear and convincing proof of the newspaper's knowledge of their falsity or probable falsity sufficient to establish actual malice. Thus, plaintiff has submitted no evidence to establish the News' knowledge of any falsity or even probable falsity of the statements that he was "brought on the carpet" by the Governor concerning his conduct of the lottery, that the previous inclusion of unsold tickets continued in the conduct of subsequent games despite plaintiff's contrary claims, or that the computer breakdown was caused by plaintiff's hasty attempt to eliminate unsold tickets from these drawings. It does no good for plaintiff to contend that if the News had actually conducted the painstaking and thorough investigation it claimed in the articles, it would have discovered the falsity of these statements, since a failure adequately to investigate does not itself establish malice (*St. Amant v Thompson,* 390 US 727, 733). Plaintiff is also not aided by the recital of various uncivil remarks of the reporters personally directed to him, since in the absence of other proof of objective facts from which an awareness of falsity or probable falsity may be inferred, animus or hostility on the part of the press does not establish malice in the constitutional sense (*Greenbelt Pub. Assn. v Bresler, supra,* pp 10-11; *Roche v Hearst Corp.,* 53 NY2d 767, 769). Finally, on the malice issue, plaintiff contends that at the two October meetings with the News' staff, it was given information establishing the probable falsity of its accusations in the explanation by plaintiff and the published rules, regulations, and promotional materials of the lottery he furnished the reporters. However, a report of an audit of the lottery by the State Comptroller's office dated November 14, 1975, which was attached to the moving affidavits of the reporters, substantiates the News' position that plaintiff's explanation was insufficient to establish awareness of falsity. That report, issued shortly after the main series of News articles, confirmed the News'

conclusions concerning the overdistribution of tickets and the heavy participation of unsold tickets in the Colossus drawings, creating an unanticipated surplus from the unawarded prizes. The report is highly critical of the lottery management and of its promotional materials leading the public to believe a grand prize would be awarded weekly. Thus, despite access to the same information plaintiff furnished the News at the October meetings, the Comptroller's office confirmed the substance of the News' major criticisms. Under these circumstances, the News' rejection of plaintiff's explanations is insufficient to establish malice (*Trails West v Wolff,* 32 NY2d 207, 220; *Edwards v National Audubon Soc.,* 556 F2d 113, 120-121, cert den 434 US 1002).

The foregoing discussion disposes of the significant charges published in the *Daily News* upon which plaintiff's second through thirteenth causes of action were founded, and the oral accusations which formed the basis for his first cause of action in slander. To the extent that factual discrepancies were reported apart from those previously discussed, our examination of the articles reveals that they would not have been so material as to alter in any significant way the conclusions a reasonable person might have drawn from reading them, and, therefore, they are not actionable (see *Rinaldi v Holt, Rinehart & Winston, supra,* p 383).

In thus determining that summary judgment was appropriately granted with respect to plaintiff's first through thirteenth causes of action, we adopt the position taken in *Yiamouyiannis v Consumers Union of the U. S.* (619 F2d 932, 940) that no special rule applies either favoring or opposing the granting of summary judgment in public official-libel cases and that such actions, for procedural purposes, are to be treated no differently from other actions (cf. *Hutchinson v Proxmire,* 443 US 111, 120, n 9; *Rinaldi v Viking Penguin,* 52 NY2d 422, 437-438). We also reject plaintiff's belated suggestion, advanced for the first time on appeal, that discretion should be exercised denying summary judgment pending his further resort to pretrial disclosure such as examinations before trial of the News' reporters and editors. In his answers to interrogatories he

states that he has "disclosed all potential sources of evidence known to him at this time". Plaintiff had ample opportunity between the service of the answer and the final submission at Special Term within which to seek further discovery if he believed that the News' reporters and editors were a necessary source of evidence on the malice issue.

We reach a different conclusion regarding the existence of a triable issue of fact as to certain statements in the article published March 14, 1976. A hiatus in coverage of the lottery of several months had taken place, during which plaintiff had resigned his position and the lottery had remained in suspension. The article, in discussing the events leading to the lottery's shutdown and the role of the News' investigation in bringing that about, states:

"Then the News, which had been investigating for several months * * * disclosed that the lottery was deliberately withholding prize money. State officials started to take another look at the surplus. It turned out to be money that should have been distributed in prizes.

"State officials tried to hide the scandal".

In our view, the damaging references specifically to plaintiff appearing elsewhere in the article, together with the extrinsic proof previously discussed showing the News' readership's identification of plaintiff as the perpetrator of the lottery's wrongful activities, are sufficient to create a triable issue of fact on whether the quoted excerpt from the March 14 article was directed against plaintiff (*Rosenblatt v Baer, supra,* pp 81-83). Moreover, "deliberately withholding prize money" and trying "to hide the scandal" are assertions of fact, not expressions of opinion, and are not accompanied by the inclusion of any other objective facts in the article to support them. Clearly they can be reasonably read as accusing someone of intentionally denying winners the prize money to which they were rightfully entitled, and then concealing that fact. The affidavits of plaintiff and members of his staff are amply sufficient to raise a triable issue on falsity. Like the charges of probable corruption in *Rinaldi v Holt, Rinehart & Winston (supra),* they can readily be understood by the average reader as meaning

plaintiff committed illegal or at least unethical acts. Therefore, if false, they are only protected by the requirement of proof of actual malice (*supra,* p 382; see, also, *Buckley v Littel, supra,* pp 896-897). On the malice issue, no sources whatsoever are set forth in the affidavits of the two reporters to support these assertions, and it is noteworthy that in none of the previous articles is the naked accusation made of any deliberate withholding of prizes. In addition to the submissions made by plaintiff at the October meetings with the News' staff, demonstrating that the Colossus Game was run in accordance with the legal requirements of the lottery law, rules, and regulations, it is critically significant that by March 14, 1976 the reporters were likely to have been familiar with the contents of the November 14, 1975 report of the State Comptroller, attached to their own moving affidavits on the instant motion. That report, while supportive of the News' charges of mismanagement, clearly negates any inference of intentional misconduct by lottery officials in connection with the running of the Colossus Game and the award of prizes. It contains an express finding of no misappropriation of funds, and its other conclusions concerning the shortcomings of the lottery are consistent only with inadvertence, not deliberate choice. In this respect, the instant case closely resembles *Alioto v Cowles Communications* (430 F Supp 1363, cert den 449 US 1102), where actual malice was inferred from the publisher's awareness of an official source contradicting charges of corrupt association. Since there was evidence from which a jury could infer that the publication of the March 14, 1976 article was made with knowledge of the probability of the falsity of its accusation of plaintiff's deliberate misconduct and concealment of that misconduct, plaintiff made a sufficient showing to warrant a trial on the issue of malice (*Rinaldi v Viking Penguin, supra,* p 437).

Accordingly, Special Term should not have granted summary judgment dismissing plaintiff's fourteenth cause of action based upon the article of March 14, 1976.

The order should be modified, on the law, by reversing so much thereof as grants defendant's motion for summary judgment dismissing plaintiff's fourteenth cause of action,

and motion denied with respect to said cause of action, and, as so modified, affirmed, without costs.

SWEENEY, J. P., MAIN, MIKOLL and WEISS, JJ., concur.

Order modified, on the law, by reversing so much thereof as grants defendant's motion for summary judgment dismissing plaintiff's fourteenth cause of action, and motion denied with respect to said cause of action, and, as so modified, affirmed, without costs.