**Seymour FINK and Phoenix Center, Inc., a Colorado corporation, Plaintiffs-Appellants,**

v.

**COMBINED COMMUNICATIONS CORP., an Arizona corporation, Ward Lucas, Sylvia Cisneros, and Anthony Accetta, Defendants-Appellees.**

**No. 81CA0986.**

Colorado Court of Appeals, Div. III.

Jan. 26, 1984.

Rehearing Denied Feb. 23, 1984.

Inman, Erickson & Flynn, P.C., H. Christopher Clark, Denver, for plaintiffs-appellants.

Hall & Evans, John D. Phillips, Jr., Daniel R. Satriana, Jr., Davis, Graham & Stubbs, Richard P. Holme, Denver, for defendants-appellees.

BABCOCK, Judge.

From the summary judgment in favor of defendants, Combined Communications Corp., Ward Lucas, Sylvia Cisneros, and Anthony Accetta, plaintiffs, Seymour Fink and Phoenix Center, Inc., appeal, presenting the following issue for review: whether the trial court erred in concluding that plaintiffs failed to present clear and convincing evidence establishing a *prima facie*

case that defendants published alleged defamatory statements with actual malice.

In September 1976, Lucas, a newscaster and reporter for KBTV, then owned by Combined Communications Corporation, began an investigation of Colorado's nursing home industry which was subsequently abandoned. Thereafter, in April 1977, Cisneros, also a reporter for KBTV, initiated a similar investigation, contacting Accetta, a former Colorado Assistant Attorney General who had been in charge of an Attorney General's investigation of the nursing home industry. In May 1977, Accetta was hired by KBTV as a consultant in connection with its investigation of the nursing home industry.

The Attorney General's investigation had been initiated pursuant to an executive order from Governor Richard D. Lamm in August 1975. Its purpose was to investigate alleged wrongdoings in the nursing home industry and to determine appropriate legal action and programmatic changes. During the course of the investigation, Accetta met Arden Bridge, administrator of Phoenix Center and previous administrator of three other Colorado nursing homes. Bridge was under investigation for supplying false information to the Board of Nursing Home Administrators in his application for a Colorado nursing home administrator's license. He agreed to provide Accetta with information concerning illegal acts committed by nursing homes and their administrators, to testify truthfully with respect to those acts in any ensuing prosecutions, and to plead guilty to the felony of supplying false information in his application. In return, Accetta agreed to state, at Bridge's sentencing hearing, that Bridge had fully cooperated with the Attorney General's office in its investigation.

The information supplied by Bridge indicated that numerous crimes were being committed within the industry. It was corroborated by physical evidence as well as information received by Accetta from other persons associated with the nursing home industry. In addition, a tape recording of a conversation between Fink and Bridge verified the commission of several acts which Bridge had accused Fink and the nursing home industry of committing. In spite of this, the investigation was terminated by the Attorney General in late 1975. In August 1977, however, based upon information gathered during the investigation, a report was submitted by the Attorney General to the Governor. It recommended legislative and regulatory changes in connection with the nursing home industry.

In May 1977, Accetta communicated the information accumulated in the course of the Attorney General's investigation to Cisneros for use in her investigation. Cisneros contacted Bridge, and several taped interviews were conducted for the purpose of a documentary to be aired on KBTV. In August 1977, production of the documentary was assumed by Lucas.

In September 1977, "Misery, Money and Whitewash" was broadcast by KBTV. The principal focus of the documentary, was the adequacy, productiveness, and sudden termination of the Attorney General's investigation. In addressing these concerns, the documentary dealt with numerous Colorado nursing homes, their administrators, and their owners.

Approximately one month later, plaintiffs filed this action alleging that certain statements contained in the broadcast were defamatory, that defendants were negligent in ascertaining the truth or falsity of the statements, and that the statements were false and were published with knowledge of their falsity. There was no dispute as to whether the subject matter of the documentary was of public concern. Therefore, the trial court, in ruling on defendants' motion for summary judgment, applied the standard applicable to constitutional defamation cases and found that plaintiffs failed to establish with clear and convincing evidence a *prima facie* case that defendants published the alleged defamatory statements with actual malice.

The news media's reporting of a matter of public concern is protected unless the alleged defamatory statements are published with actual malice, *i.e.*, with knowl-

edge that the statements are false or with reckless disregard of whether they are false or not. *Burns v. McGraw-Hill Broadcasting Co., Inc.*, 659 P.2d 1351 (Colo.1983). The test for determining whether statements are published with reckless disregard is "whether there is 'sufficient evidence to permit the conclusion that the defendant in fact entertained serious doubts as to the truth of his publication.'" *Burns v. McGraw-Hill Broadcasting Co., Inc., supra; Willis v. Perry*, 677 P.2d 961 (Colo.App.1983). And, ill will and bad motive toward the plaintiff are not elements of actual malice. *Manuel v. Fort Collins Newspapers, Inc.*, 661 P.2d 289 (Colo.App.1982) (cert. denied March 7, 1983).

■ Although a complete failure to investigate sources of corroboration of published statements may be evidence of actual malice, *Burns v. McGraw-Hill Broadcasting Co., Inc., supra; Kuhn v. Tribune-Republican Publishing Co.*, 637 P.2d 315 (Colo.1981), where an adequate investigation is conducted it is unnecessary that the truth of each and every statement be supported by the evidence. *See Walker v. Colorado Springs Sun, Inc.*, 188 Colo. 86, 538 P.2d 450 (1975); *see St. Amant v. Thompson*, 390 U.S. 727, 88 S.Ct. 1323, 20 L.Ed.2d 262 (1968); *New York Times Co. v. Connor*, 365 F.2d 567 (5th Cir.1966). Moreover, "a reporter, without a 'high degree of awareness of their probable falsity,' may rely on statements made by a single source even though they reflect only one side of the story without fear of libel prosecution ...." *New York Times Co. v. Connor, supra.*

■ In *DiLeo v. Koltnow*, 200 Colo. 119, 613 P.2d 318 (1980), the court determined that summary judgment is particularly appropriate in defamation cases and that the trial court, in determining whether an issue as to actual malice is present, must decide whether:

"'the plaintiff has offered evidence of *a sufficient quantum to establish a prima facie case,* and the offered evidence *can be equated with the standard or*

*test of convincing clarity* prescribed by United States Supreme Court decisions ....'" (emphasis in original)

Further, the party opposing the motion for summary judgment cannot rely on the allegations of his pleadings, but must present specific facts constituting a genuine issue for trial. *DiLeo v. Koltnow, supra; Lane v. Arkansas Valley Publishing Co.*, 675 P.2d 747 (Colo.App.1983).

■ Fink's answers to defendants' interrogatories show that the plaintiffs claimed they could produce evidence of the following to establish that defendants published the alleged defamatory statements with actual malice:

(1) That Bridge's statements were unreliable in that he was a chronic liar, had supplied false information in his application for a nursing home administrator's license, and had a grudge against Fink.

(2) That the polygraph examination taken by Bridge was faulty and unreliable.

(3) That Lucas stated publicly he intended to "get Fink."

(4) That a shooting incident involving Bridge was not reported to the authorities by Bridge and was actually committed by Bridge.

(5) That Phoenix Center was doing a reputable job caring for patients and the abuses stated in the documentary had not occurred.

(6) That a reasonable inquiry by defendants to state and county agencies would have shown Bridge's statements to be without basis in fact and totally unreliable.

These allegations are conclusory in nature and without specific basis in fact.

In preparation of "Misery, Money and Whitewash," Lucas met with Bridge to evaluate the truthfulness of Bridge's taped interviews with Cisneros. To satisfy himself fully of the truth of Bridge's allegations, Lucas requested that he submit to a polygraph examination. The results indicated that Bridge was truthful. Lucas also consulted approximately fifty different knowledgeable persons, including staff of the Denver District Attorney's Office, state and county health care officials, and past

and present nursing home employees and patients, to gather information and to confirm that which had been supplied by Bridge and Accetta. He also made several attempts to contact Fink to schedule an interview. When finally contacted, Fink refused the interview, but responded to some of the allegations posed to him. Moreover, the Attorney General's report to the Governor corroborated many of Bridge's allegations.

█ Measuring the evidence alleged to show actual malice in the instant case against the applicable legal standards, we conclude that plaintiffs were unable to show by clear and convincing evidence that the alleged defamatory statements were false or that defendants entertained serious doubts as to their truth. The actions taken by Lucas to investigate Bridge's allegations, which were against Bridge's self interest, civil and penal, further serve to show that Lucas did not in fact harbor serious doubt as to the truth of the allegations.

The summary judgment in favor of defendants is affirmed.

STERNBERG and TURSI, JJ., concur.