JEREMIAH MAHONEY, Respondent, v ADIRONDACK PUBLISHING COMPANY, Doing Business as ADIRONDACK DAILY ENTER-PRISE, et al., Appellants.

Third Department, December 4, 1986

### APPEARANCES OF COUNSEL

*Fischer, Hughes, Bessette & Edwards (Henry A. Fischer* of counsel), for appellants.

*Lee, LeForestier, Malone & Hanft, P. C. (David R. Murphy* of counsel), for respondent.

### OPINION OF THE COURT

LEVINE, J.

Plaintiff was and still is a public school teacher and the head coach of the varsity football team of St. Lawrence Central High School, located in Brasher Falls, St. Lawrence County. On Monday October 3, 1983, defendant Adirondack Publishing Company (hereinafter defendant) published an article in its daily newspaper, the *Adirondack Daily Enterprise,* whose circulation of about 5,000 copies generally covered the Saranac Lake, Tupper Lake and Lake Placid areas in Essex and Franklin Counties, reporting on a 31 to 7 loss by plaintiff's team in a Northern Athletic Conference away game with Tupper Lake High School. The author of the article was Thomas Bengston, also named as a defendant, then regularly employed as sports editor of the newspaper and concededly acting in that capacity in covering and reporting on the game.

The article was highly critical of plaintiff's coaching conduct during and immediately following the game. Its description of

plaintiff's behavior was the subject of 6 of its first 8 paragraphs. After noting the lopsided score, plaintiff was characterized as having "showed himself to be the big loser", who "cursed and belittled his players from the sidelines throughout the game" and in the locker room at its conclusion, where his scolding interlaced with profanities "easily could be heard by embarrassed fans outside the school building". After criticizing plaintiff's coaching strategy of relying upon a passing offense resulting in six interceptions, it was reported that each time plaintiff's quarterback came off the field after an interception, either plaintiff or an assistant coach greeted him with "Come on, get your head out of your &!(!!(&. Play the game." The report asserted that those who listened to plaintiff's verbal abuse of his team "caught a dark glimpse of high school football coaching". The penultimate paragraph of the article stated that plaintiff and his assistants had refused to talk to reporters after the game.

After becoming aware of the subject article, plaintiff brought this libel suit, alleging that the description of his abusive, vulgar and profane language toward his players was false and defamatory of his professional reputation. The action was tried by plaintiff and submitted to the jury under the assumption that, in its characterization of plaintiff's conduct as a high school coach, the article was critical of him in his capacity as a public official and, therefore, plaintiff had the burden of proving with convincing clarity both falsity and malice, i.e., defendants' actual knowledge that the descriptions were false or published with a reckless disregard for their truth or falsity (see, New York Times Co. v Sullivan, 376 US 254, 285-286; Rinaldi v Holt, Rinehart & Winston, 42 NY2d 369, 379-380, cert denied 434 US 969).

Plaintiff's principal evidence at the trial consisted of (1) the testimony of various persons who were present at the game on the field or in the visitors' bleachers, positioned in the same or closer proximity to plaintiff than Bengston (from about 10 to 30 feet from plaintiff) at all times, including the field umpire and head linesman who officiated the game, the high school cheerleaders' faculty advisor and the father of the team quarterback reportedly abused, all of whom refuted the article's charges of plaintiff's continuous use of profanities and vulgarisms toward his team on the field; (2) the testimony of the young quarterback, who described being scolded by plaintiff after some of the four (not six, as reported) interceptions he threw during the game, but categorically denied being

subjected even once to the vulgar insults attributed to plaintiff after each interception; (3) the testimony of several colleagues in the teaching and scholastic athletic fields that the article was damaging to plaintiff's professional reputation, specifically as related to his coaching ethics; (4) excerpts from Bengston's examination before trial in which he specifically identified the curse words generally described or blanked out in the article; and (5) the testimony of plaintiff's coaching assistant who spoke to Bengston after the game, and other excerpts from Bengston's examination before trial, from which the jury could have inferred that the statement in the article that plaintiff refused to talk to reporters after the game was false.

Plaintiff also testified in his own behalf, and denied verbally abusing the quarterback and using any of the obscenities ascribed to him by Bengston in his deposition. However, he did admit raising his voice and that he had used the words "hell" and "damn", and may have said "goddamn" in reprimanding his team for its poor play. From this concession, Trial Term concluded that, as to those portions of the article in which plaintiff was described as having cursed and used profanities toward his team, plaintiff had failed to sustain his burden of proving clearly and convincingly that the statements were false or published maliciously. Accordingly, the court dismissed plaintiff's cause of action as to those portions of the article and only submitted to the jury the excerpt which purportedly described plaintiff's conduct toward the quarterback.

The only defense witness was Bengston, the reporter who wrote the article. He reaffirmed the accuracy of the article's characterization of plaintiff's behavior as he had observed it, but made other damaging admissions as to the circumstances of his attempt to speak to plaintiff after the game and concerning the single, half-hearted effort to contact plaintiff before publication the following Monday.

At the conclusion of the trial, Trial Term correctly charged the jury on plaintiff's burden to establish by clear and convincing evidence each of the elements of plaintiff's cause of action as to the portions of the article describing plaintiff's remarks to the quarterback; the court also properly instructed the jury on the issues raised by the defense and submitted a 10-item jury questionnaire, which likewise specifically identified the critical issues that the jury had to resolve before granting recovery. The jury returned a verdict in plaintiff's

favor, awarding him $10,000 compensatory and $5,000 punitive damages. This appeal followed.

In urging reversal, defendant contends that, as a matter of law, the evidence was insufficient to establish either that the single excerpt from the article submitted to the jury was defamatory or that it was published with malice, that compensatory damages could not have been awarded in the absence of proof of special damages, and that the evidence was also insufficient to have permitted submission of the issue of punitive damages to the jury.

■ Regarding the sufficiency of the evidence to establish with convincing clarity that the paragraph of the article upon which the jury based its verdict was defamatory of plaintiff and that it was published with malice, we recognize that, in a media libel case such as this, an appellate court must undertake an independent review of the entire record to determine whether the constitutionally mandated, heightened standard of proof has been met *(Bose Corp. v Consumers Union,* 466 US 485, 510; *New York Times Co. v Sullivan,* 376 US 254, 285, supra). Whether the statement complained of is actionable, i.e., reasonably susceptible of a defamatory meaning in its effect upon the average reader, is to be determined by considering the words in the context of the article as a whole and in the circumstances of its issuance *(see, Silsdorf v Levine,* 59 NY2d 8, 12-13, *cert denied* 464 US 831; *James v Gannett Co.,* 40 NY2d 415, 419-420). In our view, accusing plaintiff of repeatedly castigating his young quarterback in vulgar, demeaning terms, read in the context of the general theme expressed in the article that plaintiff's behavior furnished a "dark glimpse of high school football coaching", could readily be understood as charging plaintiff with unethical or incompetent conduct in his professional occupation as a scholastic athletics coach. Factual disparagement of a person's professional ethics or competence may constitute actionable defamation *(Buckley v Littell,* 539 F2d 882, 895-896, *cert denied* 429 US 1062; *Carney v Memorial Hosp. & Nursing Home,* 64 NY2d 770, 772; *Bruno v New York News,* 89 AD2d 260, 268). This conclusion is not obviated because plaintiff was unable to sustain his burden of proof as to the remaining critical portions of the article. Thus, in *Buckley v Littell (supra),* recovery for charging news columnist William F. Buckley with engaging in libelous journalism was upheld, despite dismissal as to other portions of a book that were highly critical of Buckley. In the present case, the portrayal of plaintiff as singling out

the quarterback for repeated, crudely phrased public humiliation could have been found even more egregious than his castigation of the other players, collectively. Hence, it cannot be said, as a matter of law, that the excerpt was not material in its disparagement of plaintiff *(see, Rinaldi v Viking Penguin,* 52 NY2d 422, 436-437).

The sufficiency of plaintiff's demonstration of malice presents a more difficult issue. On this element of plaintiff's case, the proof must be clear and convincing that defendant, through its reporter, Bengston,* realized that the statement was false or had a high degree of awareness of its probable falsity *(see, St. Amant v Thompson,* 390 US 727, 731). In establishing defendant's subjective state of mind, plaintiff did not nor was he required to prove Bengston's ill will or desire to injure him *(Cantrell v Forest City Pub. Co.,* 419 US 245, 251-252; Restatement [Second] of Torts § 580A comment d [1977]). Similarly, that Bengston testified at the trial that he believed the statement was true is not fatal to plaintiff's case. As stated by the United States Supreme Court in *St. Amant v Thompson (supra,* p 732): "The defendant in a defamation action brought by a public official cannot, however, automatically insure a favorable verdict by testifying that he published with a belief that the statements were true. The finder of fact must determine whether the publication was indeed made in good faith. Professions of good faith will be unlikely to prove persuasive, for example, where a story is fabricated by the defendant, is the product of his imagination, or is based wholly on an unverified anonymous telephone call."

The problem here is that much of the evidence on the malice issue overlaps the proof of the falsity of the libelous report. Although Trial Term fairly characterized the proof of falsity as "overwhelming", a recent Supreme Court case suggests that, as a general proposition, the requisite malice at the time of publication may not be inferred merely because the trier of fact is properly convinced that the statement complained of is inaccurate and, based largely thereon, rationally discredits the reporter's testimonial profession of a present belief (at the trial) that the statement was true *(Bose Corp. v Consumers Union,* 466 US 485, 512, *supra).* The Supreme Court in *Bose Corp.,* however, made the foregoing holding in

---

* Defendant is legally responsible for the conduct of its employees through whom it acts *(see, Cantrell v Forest City Pub. Co.,* 419 US 245, 254-255; *Karaduman v Newsday, Inc.,* 51 NY2d 531, 553).

reviewing a recovery for an allegedly false description of the sound quality of a loudspeaker, i.e., a purportedly firsthand report of a phenomenon the reporter experienced which was not readily translatable into a precise, singular verbal description. As the court noted: "Here, however, adoption of the language chosen was 'one of a number of possible rational interpretations' of an event 'that bristled with ambiguities' and descriptive challenges for the writer * * * The choice of such language, though reflecting a misconception, does not place the speech beyond the outer limits of the First Amendment's broad protective umbrella" (supra, at pp 512-513, quoting Time, Inc. v Pape, 401 US 279, 290). Furthermore, the court contrasted that type of statement with that of a report of an observed event of the kind which does not at all defy exact description. " 'Analysis of this kind may be adequate when the alleged libel purports to be an eyewitness or other direct account of events that speak for themselves' " (supra, at p 512, quoting Time, Inc. v Pape, 401 US 279, 285, supra; emphasis in original). Here, Bengston was positioned from 20 to 30 feet away from plaintiff during the entire game and did not contest in any way his complete opportunity and ability to hear what was actually said on the six occasions of loud, vulgar demeaning of the quarterback described in the article. Thus, this case is more akin to an " 'eyewitness * * * account of events that speak for themselves' " (supra, p 512), which was excepted from the holding in Bose Corp.

Moreover, there was additional evidence adduced at the trial from which the jury could have inferred bad faith. First, although the remaining critical descriptions of plaintiff in the article were not submitted to the jury because of plaintiff's failure to meet the clear and convincing standard of proof of falsity or malice, the jury, nevertheless, could have found on the evidence that those portions of the article had grossly exaggerated the extent of plaintiff's misconduct. Second, and more importantly, the jury had strong proof that the article's statement that plaintiff refused to talk to reporters after the game was intentionally false. Bengston admitted never speaking to plaintiff and that, upon requesting an interview through plaintiff's assistant, while outside the locker room where plaintiff was addressing the team after the game, he was told "to wait outside and that, they would tell [plaintiff] that [Bengston] wanted to talk to him", and that he then left after waiting a half hour. Like the false report of a nonexistent interview with the plaintiff in Cantrell v Forest City Pub.

*Co.* (419 US 245, *supra)* Bengston here had to have known that plaintiff did not directly or even indirectly refuse to speak to him and, thus, the jury would have been "plainly justified in finding" that this report was made "through knowing or reckless untruth" *(supra,* at p 253).

On the basis of the foregoing, we conclude that there was sufficient evidence, taken cumulatively, which if believed, could have strongly convinced the jury that, in order to substantiate his general theme of plaintiff's conduct as a "dark glimpse of high school football coaching", Bengston intentionally or recklessly distorted the interchanges he heard between plaintiff and the quarterback as set forth in the article. Thus, the jury's specific finding of malice cannot be disturbed.

Defendant's challenge to the award of compensatory damages is also unavailing. Plaintiff submitted proof of actual harm to his reputation and, thus, to whatever extent recovery for presumed damages in libel per se is no longer constitutionally permitted *(see, Gertz v Robert Welch, Inc.,* 418 US 323, 349-350; Restatement [Second] of Torts §§ 620-623 [1977]), that limitation was not violated here. Likewise, the evidence was sufficient for the jury to conclude that the "single instance" rule, requiring proof of special damages for any recovery where only a single act of impropriety is falsely charged, did not apply *(see, Ocean State Seafood v Capital Newspaper,* 112 AD2d 662, 666).

■ We reach a different conclusion with respect to the award of punitive damages. Although the question is still open as to whether, under any circumstances, punitive damages may be recovered for a libel against a public official *(Buckley v Littell,* 539 F2d 892, 897, *supra),* such an award is at least subject to strict appellate scrutiny because of its inhibiting effects on the news media *(Gertz v Robert Welch, Inc.,* 418 US 323, 350, *supra).* In New York, the imposition of punitive damages requires proof, not only of malice in its constitutional sense, but also of common-law malice directed at the injured plaintiff. That is, the evidence must establish that the defendant published with a desire to harm the plaintiff, or with a reckless disregard for its injurious effect upon him *(Corrigan v Bobbs-Merrill Co.,* 228 NY 58, 66-67; *Wood v Lee,* 41 AD2d 730, 731; *Clevenger v Baker Voorhis & Co.,* 19 AD2d 340, *affd* 14 NY2d 536; *Frechette v Special Mags.,* 285 App Div 174, 175; Sack, Libel, Slander and Related Problems, at 350-353). Our review of the record fails to disclose sufficient evidence of

common-law malice. Bengston was a novice professional at the time of publication, writing for a newspaper whose general area of circulation was a considerable distance from plaintiff's residence and workplace. Thus, the evidence of constitutional malice which we have found sufficient does not necessarily establish any ill will against plaintiff or a conscious disregard for the injurious effects of the article upon plaintiff's reputation. Accordingly, the award of punitive damages must be stricken.

KANE, J. P., MAIN, YESAWICH, JR., and HARVEY, JJ., concur.

Judgment modified, on the law and the facts, without costs, by striking so much thereof as awarded plaintiff punitive damages, and, as so modified, affirmed.