Linda Ann LEWIS and Dwayne Lewis, individually, and on Behalf of Their Minor Child, Tasha Lewis, Plaintiffs–Appellants,

v.

McGRAW–HILL BROADCASTING COMPANY, INC., a Colorado corporation, d/b/a Channel 7 News, and News Reporter, Lynn Setzer, individually and as agent for McGraw–Hill, and Ernie Bjorkman as the agent for McGraw–Hill, Defendants–Appellees.

No. 90CA1834.

Colorado Court of Appeals, Div. V.

May 21, 1992.

As Modified June 23, 1992.

Smith & Schaffer, C. Lamont Smith, Denver, for plaintiffs-appellants.

Holland & Hart, A. Bruce Jones, William Corwin, Denver, for defendants-appellees.

Opinion by Judge REED.

Plaintiffs, Linda Ann Lewis, Dwayne Lewis, and Tasha Lewis, appeal the summary judgment dismissing their complaint for defamation against defendants, McGraw–Hill Broadcasting Company, Inc., d/b/a Channel 7 News; Lynn Setzer; and Ernie Bjorkman. We affirm.

On June 10, 1989, plaintiff Linda Ann Lewis was forcibly arrested for shoplifting by security personnel at a J.C. Penney Co.'s store in Aurora, Colorado. She was subsequently convicted of that charge.

On November 29, 1989, she and her husband filed a civil suit against J.C. Penney Co. In the complaint it was alleged that she had been seriously and unjustifiably beaten during the arrest. It was further alleged that J.C. Penney Co. had adopted a policy and practice of discriminating against its black customers, of which she was one, and of identifying "suspect consumers" based on race. Recovery was sought on behalf of Ms. Lewis and her husband, and for harm to their unborn child, in the amount of $15 million.

The filing of this complaint brought immediate and widespread publicity from the various media organizations (radio, television, and newspapers). This publicity was directed toward the circumstances of plaintiff's arrest and her charges of brutality and racial discrimination in connection therewith.

The filing of this complaint also resulted in immediate and highly publicized meetings of various civil rights organizations and leaders of the community. Each of these meetings was directed toward an investigation of whether Linda Ann Lewis' claims of systematic racial discrimination were valid and what, if any, action, including boycott, should be instituted against J.C. Penney Co. These meetings were attended and reported to the public by members of the different media organizations through radio, television, and newspapers.

At the first of these meetings, on December 2, 1989, a videotape of the actual arrest was displayed. This evoked harsh criticisms by prominent black leaders concerning the force used in making the arrest, the store's policies and actions towards suspected shoplifters, and whether racial considerations played any part therein.

A similar public meeting was held two days later. This meeting was attended by, among others, plaintiffs' then counsel in the pending civil suit and by the defendant Setzer on behalf of Channel 7. At the close of the meeting and in discussing the civil action instituted by him, the attorney stated to the media representatives, including Setzer, that his client Linda Ann Lewis had no prior criminal record.

Upon Setzer's return to the TV station that afternoon, however, she was told by another station employee that the public information officer of the Aurora Police Department had just reported to him, in response to his telephonic inquiry, that Linda Ann Lewis had previously been arrested for prostitution, indecent exposure and obstruction of justice, but that the outcome of those charges were unknown to her. This information was obtained by this officer from a check of the computer records of the Colorado Crime Information Center (CCIC).

The inquiry by the station employee of the information officer was part of his routine duties in checking with law enforcement agencies for newsworthy items. It is undisputed that information from this police department employee had been provided to the station for several years and to Setzer's knowledge had always been accurate.

Before Channel 7 went on the air with the five o'clock newscast, Setzer attempted to phone plaintiffs' attorney concerning this conflicting information—twice, according to Setzer and once, according to the attorney's records—but her telephone call or calls were not returned. As a result, there was added to the station's five o'clock news script the statement hereafter quoted which is the subject matter of plaintiffs' complaint.

During the newscast, the defendant Bjorkman referred to the meeting with store officials held that day and to the fact that some members of the black community were calling for a boycott of J.C. Penney Co. He also stated that a black woman had been arrested and convicted of shoplifting and had filed a $15 million lawsuit because she claimed to have been "roughed up."

The broadcast then concluded with this statement:

Lewis' attorney says his client has no previous arrest record. The Aurora Police report, though, that Lewis was picked up for obstructing justice, indecent exposure and prostitution. It is not

known if she was convicted of these charges.

Subsequent to the broadcast, the Aurora information officer determined that the arrest information recited in the broadcast was erroneous in that the arrests were of persons other than plaintiff, although at least one of them had used the name Linda Ann Lewis. Upon the station being advised of this circumstance, it broadcast a retraction of the item with an explanation that it was a result of mistaken identity.

## I.

Plaintiffs first contend the trial court erred in determining that the statement at issue involved a matter of public concern and, additionally, in determining that Ms. Lewis was a limited purpose public figure. We disagree.

## A.

### Scope of Public Issue

■ Criteria for deciding whether an allegedly defamatory statement involves a matter of public concern, so as to require the comprehensive protection of the First Amendment, have not been precisely identified. However, in a related context our supreme court has proposed that distinctions can and should be drawn in defamation cases between matters having public significance and matters purely private in nature. *See Walker v. Colorado Springs Sun, Inc.,* 188 Colo. 86, 538 P.2d 450 (1975). Whether the matter involved is of public concern is a question of law for the court. *Walker v. Colorado Springs Sun, Inc., supra.*

In *Walker,* the Colorado Supreme Court adopted in part the plurality opinion in *Rosenbloom v. Metromedia, Inc.,* 403 U.S. 29, 91 S.Ct. 1811, 29 L.Ed.2d 296 (1971). In a civil defamation action brought by a private individual against a radio station, *Rosenbloom* held that, if the statement related to that individual's involvement in an event of *public concern,* First Amendment protections required clear and convincing proof that the statement was known by the declarant to be false or made with reckless disregard for its truth. In making this determination, the *Rosenbloom* court applied the same test applicable to cases dealing with constitutional limits on liability for invasion of privacy. *See Time, Inc. v. Hill,* 385 U.S. 374, 87 S.Ct. 534, 17 L.Ed.2d 456 (1967).

The scope of that constitutional privilege in invasion of privacy cases is set forth in Restatement (Second) of Torts § 652(D) comment j (1977) as follows:

> The scope of a matter of legitimate concern to the public is not limited to 'news' in the sense of reports of current events or activities. It extends also to the use of names, likenesses or facts in giving information to the public for purposes of education, amusement, or enlightenment when the public may reasonably be expected to have a legitimate interest in what is being published.

This formulation can be read to suggest that a defamatory statement addresses a matter of public concern whenever it embraces an issue about which information is needed or is appropriate. *Cox Broadcasting Corp. v. Cohn,* 420 U.S. 469, 95 S.Ct. 1029, 43 L.Ed.2d 328 (1975).

Here, the statement in the newscast incorrectly implying that Ms. Lewis had been previously arrested surely involved a subject matter of sufficient public concern to implicate First Amendment protections. This is evident for essentially two reasons. Most important is the fact that the newscast emerged in the context of a persistent and concededly public controversy over J.C. Penney Co.'s policies toward minorities, a controversy triggered by publicity surrounding plaintiffs' $15 million lawsuit and their allegations of racially discriminatory policies by J.C. Penney Co. It is also relevant that the newscast was partly brought on by plaintiffs' then attorney who sought to inform the media that his client had never been arrested prior to the incident at the J.C. Penney Co.'s store.

It was no coincidence that sustained media attention of the altercation at the J.C. Penney Co.'s store and the threatened boycott followed on the heels of plaintiffs' lawsuit against that business because of

the nature of her allegations of racial discrimination. Accordingly, we view the newscast in its logical context, as a mere extension of the controversy over Ms. Lewis' treatment by the employees of J.C. Penney Co., and thus, the circumstance concerning the report of a prior arrest record became of public importance in evaluating the credibility of each side in that controversy.

Furthermore, we note that it would be difficult to suggest that a plaintiff's arrest record under the circumstances here should not be of public concern when the same already appears in public files and when reports of such records are routinely released to the media. *See Florida Star v. B.J.F.*, 491 U.S. 524, 109 S.Ct. 2603, 105 L.Ed.2d 443 (1989); *Bowers v. Loveland Publishing Co.*, 773 P.2d 595 (Colo.App. 1988).

### B.

### Limited Public Figure

■ The concept of a limited purpose public figure has been explicated in several Colorado cases. *Diversified Management, Inc. v. Denver Post, Inc.*, 653 P.2d 1103 (Colo.1982); *DiLeo v. Koltnow*, 200 Colo. 119, 613 P.2d 318 (1980); *Walker v. Colorado Springs Sun, Inc., supra.* These cases apply the United States Supreme Court's definition of limited purpose public figure set out in *Gertz v. Robert Welch, Inc.*, 418 U.S. 323, 94 S.Ct. 2997, 41 L.Ed.2d 789 (1974).

The court in *Gertz* identified a limited purpose public figure as one who "voluntarily injects [herself] or is drawn into a particular controversy and thereby becomes a public figure for a limited range of issues" such that the person has achieved "special prominence in the resolution of public questions." Limited purpose public figure status focuses on two questions: the threshold question of whether the defamatory statement involves a matter of public concern and, more importantly, whether the level of plaintiff's participation in the controversy invites scrutiny. *Wolston v. Reader's Digest Ass'n*, 443 U.S. 157, 99

S.Ct. 2701, 61 L.Ed.2d 450 (1979); *Gertz v. Robert Welch, Inc., supra.*

Applying these criteria to the situation at issue, we conclude that the trial court was correct in determining that Ms. Lewis was a limited purpose public figure. The newscast repeated information received by Channel 7 from the Aurora Police and continued with the statement quoting Ms. Lewis' then attorney who had informed the Channel 7 reporter in an interview that his client had no prior arrest record. The attorney's readiness to speak to the media was obviously an effort to gather public support for his clients' cause and to bring to light wrongdoing on the part of J.C. Penney Co.

Properly viewed, this is a case involving a plaintiff who, by her civil suit, protested racially motivated policies of a large retail establishment which allegedly had been directed against her—a matter inherently of public concern—and arranged to do so in the courts, a public forum. The allegations of her suit had resulted in community-based action including a meeting attended by her attorney in which he spoke on her behalf. This activity runs counter to the notion that plaintiff should not be regarded as properly subject to public scrutiny. In these circumstances, *Gertz* and its progeny compel a determination that Ms. Lewis became a limited purpose public figure and thus did not retain her status as a private person.

### II.

Plaintiffs next argue that regardless whether the newscast involved a matter of public concern and Ms. Lewis' status as a limited purpose public figure, the trial court nevertheless erred in concluding that plaintiffs failed to present clear and convincing evidence establishing a *prima facie* case of actual malice. We disagree.

■ If, as here, plaintiff in a defamation action is a public figure, or an allegedly defamatory statement involved a matter of public concern, she cannot recover unless she proves by clear and convincing evidence that the defendant published the defamatory statement with actual malice, i.e.,

with knowledge of falsity or in reckless disregard of the truth. *New York Times Co. v. Sullivan,* 376 U.S. 254, 84 S.Ct. 710, 11 L.Ed.2d 686 (1964); *Diversified Management, Inc. v. Denver Post, Inc., supra.*

■ That a reasonably prudent person would not have published the defamatory statement or would have investigated before publishing does not suffice. Rather, the plaintiff must demonstrate that the defendant in fact entertained serious doubts as to the truth of the statement, *St. Amant v. Thompson,* 390 U.S. 727, 88 S.Ct. 1323, 20 L.Ed.2d 262 (1968); *Seible v. Denver Post, Corp.,* 782 P.2d 805 (Colo.App.1985), or acted with a high degree of awareness of its probable falsity. *Kuhn v. Tribune–Republican Publishing Co.,* 637 P.2d 315 (Colo.1981).

■ In our view, there was not sufficient evidence to permit the conclusion that defendant in fact entertained serious doubts as to the truth of the report that Ms. Lewis had been arrested. The absence of such doubts is demonstrated by plaintiff's failure to rebut testimony by the defendant Setzer, which indicated her reliance in good faith upon the information supplied by the police and her lack of awareness of its probable falsity. While one could reject as self-serving Setzer's profession of good faith, malice cannot be inferred solely from the combination of the report being false and the failure of defendants in not checking all possible sources of corroboration or verification. *Seible v. Denver Post, Corp., supra.*

Although Channel 7 could have verified the identity of the person arrested by a check of the records kept by the police, we do not think that the station had an obligation to do so in this case. The public information officer was a proper and reliable source and information regarding arrests was routinely provided to the media pursuant to established policies. Furthermore, such information had in the past been accurate, and there was no indication of irregularity in the police procedures such that the possibility for error in identification was great. *Cf. Burns v. McGraw–Hill Broadcasting, Co., Inc.,* 659 P.2d 1351 (Colo.1983).

Publication of the fact that one has been arrested can cause serious damage to that person's reputation even if presented in a neutral and detached manner, but the reporter here had reason to believe the police report was true. The name and physical description checked out, and no other discrepancy of any significance appeared so as to cast serious doubt on the accuracy of the official report.

■ Based on the foregoing, we hold that when, as here, members of the media have an objective basis to rely on the accuracy of an official report which relates to a matter of public concern or which involves a public figure, then publication need not be delayed in order to investigate its accuracy or to obtain corroboration from all possible sources. *Seible v. Denver Post, Corp., supra; Bowers v. Loveland Publishing Co., supra; Fink v. Combined Communications, Corp.,* 679 P.2d 1108 (Colo.App.1984) ("a reporter, without a 'high degree of awareness of their probable falsity' may rely on statements made by a single source even though they reflect only one side of the story without fear of libel prosecution"). To impose liability in such a case, as here, would create unrealistic burdens on the news media.

### III.

### Propriety of Summary Judgment

Our courts have recognized that, because of the heavy burden placed on plaintiffs in cases involving public figures or matters of public concern, courts must shoulder the responsibility of protecting First Amendment values. Thus, it has been held that these constitutional questions, as well as issues relating to the sufficiency of plaintiffs' evidence on the issue of liability should be resolved by the court within the framework of summary judgment. *DiLeo v. Koltnow, supra.*

■ In so doing, courts are required to consider several important modifications to ordinary rules governing disposition of

claims on summary judgment. For example, the party opposing summary judgment is not entitled to rely on the pleadings, but must raise a genuine issue for trial based on specific evidentiary facts. *DiLeo v. Koltnow, supra; Fink v. Combined Communications Corp., supra; Lane v. Arkansas Valley Publishing Co.,* 675 P.2d 747 (Colo.App.1983). Furthermore, a denial by such party of facts asserted in support of summary judgment will not be availing to raise a genuine issue for trial. *Seible v. Denver Post, Corp., supra.* Finally, the sufficiency of plaintiffs' evidence is to be evaluated by the clear and convincing standard of proof. *DiLeo v. Koltnow, supra.*

■ If the trial court grants a motion for summary judgment, an appellate court is obliged to scrutinize independently the record and decide whether the evidence suffices to show that defendants acted with the requisite knowledge of falsity or reckless disregard as to truth or falsity. *DiLeo v. Koltnow, supra.* The prescribed review has been characterized as *"de novo." Kuhn v. Tribune–Republican Publishing Co., supra; Reddick v. Craig,* 719 P.2d 340 (Colo.App.1985).

■ Here, plaintiffs, in response to the motion for summary judgment, relied upon the affidavit of their attorney which set forth that the Channel 7 reporter had been properly advised with respect to Ms. Lewis' prior arrest. The plaintiffs also submitted the affidavit of a law clerk employed by the attorney purporting to show that one of the other local television stations had conducted an investigation and was able to determine the Aurora Police information was false. By implication then, plaintiffs sought to establish that the defendant reporter would have had reason to doubt the accuracy of the police report or the reliability of its source.

However, a reporter is not obliged to accept denial of wrongdoing as conclusive and the failure to corroborate information received from a reliable source does not serve to establish actual malice. *See Seible v. Denver Post, Corp., supra.* Accordingly, there being nothing else in the record here to indicate the reporter had reason to doubt the accuracy of the information provided by the Aurora Police Department, we perceive no evidence of conduct on the part of defendants which could be considered actual malice. *Seible v. Denver Post, Corp., supra; see also Bowers v. Loveland Publishing Co., supra.* Hence, there could be no recovery by plaintiffs for defamation, and summary judgment of dismissal was properly entered.

## IV.

Plaintiffs also contend that the trial court's order which quashed a subpoena to an employee of a local Denver television station was in error and prevented them from countering the summary judgment motion. According to plaintiffs, this individual would have testified concerning media conduct, the standard of care required of the reporter in this case, and the adequacy of defendants' investigation of the information supplied by the Aurora Police Department. The testimony would arguably have raised an inference that defendants acted with reckless disregard for the truth in reporting the prior arrest, thereby precluding summary judgment.

In view of our determination that the defendants were under no duty to verify the objectively reliable information in this case, plaintiffs' contentions in this regard are deprived of significance. Accordingly, we decline to address the merits of this issue.

## V.

Plaintiffs' remaining claims against defendants were for negligence and infliction of emotional distress. The trial court dismissed these claims in conjunction with its order granting summary judgment for defendants on the defamation claim. We agree with that disposition.

■ Under the rule of *Hustler Magazine v. Falwell,* 485 U.S. 46, 108 S.Ct. 876, 99 L.Ed.2d 41 (1988), principles emanating from *New York Times v. Sullivan, supra,* apply equally to ancillary tort claims which might arise from the publication of an al-

legedly defamatory statement. Consequently, plaintiffs may not recover for the tort of intentional infliction of emotional distress or negligence by reason of such publications without showing that it was made with actual malice.

Our review of the record here discloses insufficient evidentiary support for finding that the newscast was made with knowledge of its falsity or with reckless disregard as to whether it was true. In the absence of such record, plaintiffs could not recover for incidental claims occasioned by the misstatement of fact. Accordingly, summary judgment was properly granted with respect to these claims.

Because of our resolution, consideration of the other contentions is not required.

Judgment affirmed.

RULAND, J., concurs.

DUBOFSKY, J., specially concurs. ·

Judge DUBOFSKY specially concurs.

Good name in man, and woman, dear my lord, Is the immediate jewel of our souls. Who steals my purse steals trash. 'Tis something, nothing;

'Twas mine, 'tis his, and has been slave to thousands;

But he that filches from me my good name

Robs me of that which not enriches him, And makes me poor indeed.

Shakespeare, *Othello*, III.iii. 155–61 (Iago).

I concur in the majority opinion but write separately to express my view that while the existing case law may require the result reached by the majority, nevertheless, it is fundamentally unfair. The jettisoning of the usual rules applicable to motions for summary judgment, combined with the special status accorded the media, operate to deny plaintiff her day in court.

In libel cases involving a public figure or public issue, the courts have taken different approaches in evaluating the evidence in a summary judgment motion. By applying restrictive legal standards against plaintiffs, many courts have reached the point that granting summary judgments in favor of the media is the rule. *See Yiam-ouyiannis v. Consumers Union*, 619 F.2d 932 (2d Cir.1980); *Lauderback v. American Broadcasting Cos.*, 741 F.2d 193 (8th Cir.1984), *cert. denied*, 469 U.S. 1190, 105 S.Ct. 961, 83 L.Ed.2d 967 (1985); *Brophy v. Philadelphia Newspapers, Inc.*, 281 Pa.Super. 588, 422 A.2d 625 (1980); *Maressa v. New Jersey Monthly*, 89 N.J. 176, 445 A.2d 376 (1982), *cert. denied*, 459 U.S. 907, 103 S.Ct. 211, 74 L.Ed.2d 169 (1982).

Other courts in deciding summary judgment motions in libel cases have refused to impose more substantial legal requirements on the parties than those found in other civil cases. *See Bryant v. Associated Press*, 595 F.Supp. 814 (D.V.I.1984); *American Benefit Life Insurance Co. v. McIntyre*, 375 So.2d 239 (Ala.1979).

Unfortunately, Colorado is among the jurisdictions that have adopted a different and more demanding standard of proof for a plaintiff in a libel action to meet when faced with a summary judgment motion than it uses in other types of cases. *Compare DiLeo v. Koltnow*, 200 Colo. 119, 613 P.2d 318 (1980), *Russell v. McMillen*, 685 P.2d 255 (Colo.App.1984), and *Manuel v. Fort Collins Newspapers, Inc.*, 42 Colo. App. 324, 599 P.2d 931 (1979), *rev'd on other grounds*, 631 P.2d 1114 (Colo.1981) *with Hatfield v. Barnes*, 115 Colo. 30, 168 P.2d 552 (1946) and *Dominguez v. Babcock*, 727 P.2d 362 (Colo.1986).

Given the extraordinary legal protections already available to media defendants in libel cases involving public figures or public issues, I do not believe that a different and harsher summary judgment standard for deciding these cases is either necessary or desirable. *See Hutchinson v. Proxmire*, 443 U.S. 111, 99 S.Ct. 2675, 61 L.Ed.2d 411, (1979) (fn. 9); *Clark v. American Broadcasting Cos.*, 684 F.2d 1208 (6th Cir.1982); *Pep v. Newsweek, Inc.*, 553 F.Supp. 1000 (S.D.N.Y.1983); *Bryant v. Associated Press, supra; Cinker, Inc. v. Northern Gas Co.*, 578 F.Supp. 112 (D.Wyo.1983); *Bruno v. New York News, Inc.*, 89 A.D.2d 260, 456 N.Y.S.2d 837 (1982).

Here, the extremely destructive nature of these accusations, when coupled with the attorney's contradictory statement, should have caused defendants to investigate and take steps to ensure that the police department information was accurate. Postponing the report to complete such investigation might have cost the TV station an audience rating point, but it would not have in any way cheapened the First Amendment.

A reputation woven by a lifetime of work may be left in tatters by a 20-second sound bite. Media conglomerates which have the extraordinary capability to be so destructive to a person's life should be legally accountable if, as here, they fail to act responsibly.

While I do not object to the standards enunciated in *New York Times v. Sullivan*, 376 U.S. 254, 84 S.Ct. 710, 11 L.Ed.2d 686 (1964) and its progeny, I do question the misuse of summary judgment as a tool to prevent a jury from deciding a case under those rigorous standards. Unfortunately, the present state of the summary judgment law appears to permit such defendants to avoid any liability for the harm caused by their erroneous statements. *See DiLeo v. Koltnow, supra; Russell v. McMillen, supra.*