### William QUIGLEY and Dorothy Quigley a/k/a Dee Quigley, Plaintiffs,

v.

### Saul F. ROSENTHAL, in his individual capacity and in his capacity as representative of the Anti–Defamation League, and the Anti–Defamation League, Defendants.

**Civil Action Nos. 94 N 2782, 95 N 2916.**

United States District Court, D. Colorado.

March 11, 1999.

**1168**

Jay S. Horowitz, Philip L. Gordon, Krendl, Horowitz & Krendl, Denver, CO, for plaintiffs.

David B. Higgins, Joseph C. Jaudon, Richard T. D'Ambrosio, Long & Jaudon, Denver, CO, for defendants.

**1.** The court recognizes that since the events underlying this lawsuit occurred, the Aronsons have divorced, and Mrs. Aronson has resumed the use of her maiden name, Ross.

## ORDER AND MEMORANDUM OF DECISION

NOTTINGHAM, District Judge.

This is a defamation and wiretap case. Plaintiffs William and Dorothy Quigley allege that Defendants the Anti–Defamation League ("ADL") and Saul F. Rosenthal, in his individual and representative capacity, conducted a campaign of defamation against them in order to falsely portray the Quigleys as anti-Semites. The Quigleys raise twenty-nine claims against defendants, alleging that defendants caused Mitchell and Candice Aronson[1] to intercept the Quigley family's private telephone conversations and then used those recorded conversations to publicly depict the Quigleys as anti-Semitic. Specifically, the Quigleys allege that defendants: (1) violated the Omnibus Crime Control and Safe Streets Act of 1968, *as amended* by the Electronic Communications Privacy Act of 1986 and the Communications Assistance for Law Enforcement Act of 1994, 18 U.S.C.A. §§ 2510–22 (West 1970 & Supp. 1998) [hereinafter "Federal Wiretap Act"]; (2) deprived them of their right to be free from impermissible wiretapping under 42 U.S.C.A. § 1983 (West 1994 & Supp.1998) [hereinafter "section 1983"]; (3) defamed and conspired to defame them; (4) invaded their privacy; (5) conducted themselves outrageously; (6) maliciously prosecuted them; (7) abused the judicial process; and (8) intentionally interfered with Mr. Quigley's prospective employment opportunities. The matter is before the court on: (1) "Anti–Defamation League and Saul F. Rosenthal's Motion for Reconsideration of the Court's Ruling that ADL and Rosenthal are not Journalists or Motion for Protective Order and Request for Oral Argument" filed August 3, 1998; (2) "ADL and Rosenthal's Motion for Summary Judgment re: First Amendment" filed August 12, 1998; (3) "ADL and Rosenthal's Mo-

For the sake of clarity and because Ross used the name Aronson during the events described herein, this order refers to her by the name Aronson throughout.

tion for Summary Judgment re: Agency" filed August 12, 1998; and (4) "ADL and Rosenthal's Motion for Summary Judgment re: Claims for Violation of Constitutional Rights" filed August 12, 1998. Jurisdiction is based on 28 U.S.C.A. §§ 1331, 1343(a)(1), and 1367 (West 1993).

## FACTS

In August 1994, the Aronsons moved into a house at 1724 Prima Lane in Evergreen, Colorado. (The Quigleys' Resps. to ADL's and Rosenthal's Statements of Undisputed Material Facts and the Quigleys' Statement of Additional Undisputed Facts—Portions of Pls.' Combined Mem. in Opp'n to Defs. ADL's and Rosenthal's Several Mots. for Summ.J., Statement of Additional Disputed Facts ¶ 8 [filed Oct. 6, 1998] [hereinafter "Pls.' Resp. Facts"].) The Quigleys lived two houses down the street from the Aronsons. (*Id.*, Statement of Additional Disputed Facts ¶ 19.) Starting in the fall of 1994, the two families appear to have developed an enmity which has since spawned extensive litigation involving multiple parties.

According to the Aronsons, the Quigleys did not want them to live in the neighborhood because they are Jewish. (Verified Compl. for Injunctive Relief, Damages[,] and Jury Demand ¶¶ 3–4 [filed Dec. 6, 1994] [hereinafter "Aronsons' Compl."].) The Aronsons maintain that, starting shortly after they moved into their new home, the Quigleys conspired to harass and intimidate them so as to force them to leave the neighborhood. (*See id.* ¶ 3.) At some point in the late summer or early fall of 1994, the Aronsons began using a police scanner to intercept and then tape record the Quigleys' telephone conversations with third parties. (ADL and Rosenthal's Mem. Br. in Supp.Mot. [sic] for Summ.J. re: Claim of Violation of Quigleys' Constitutional Rights, Statement of Undisputed Material Facts ¶ 5 [filed Aug. 12, 1998] [hereinafter "Defs.' Constitutional Br."]; *admitted in pertinent part at* Pls.' Resp. Facts, The Quigleys' Resp. to Statement of Undisputed Material Facts in Mot. for Summ.J. re: Claim of Violation of Quig-leys' Constitutional Rights ¶ 5.) Based in large part on the content of these intercepted telephone conversations, the Aronsons alleged that the Quigleys made anti-Semitic comments about them and their children. (*Id.*, Statement of Undisputed Material Facts ¶ 3; *admitted in pertinent part at* Pls.' Resp. Facts, The Quigleys' Resp. to Statement of Undisputed Material Facts in Mot. for Summ.J. re: Claim of Violation of Quigleys' Constitutional Rights ¶ 3.)

On October 21, 1994, Mr. Aronson made his initial contact with the ADL, when he reported to Barbara Towbin, senior associate director of ADL's Mountain States regional office, that the Quigleys were harassing him and Mrs. Aronson because they are Jewish. (Pls.' Resp. Facts, Statement of Additional Disputed Facts ¶ 44.) Between October 21 and December 7, 1994, the Aronsons continued to intercept and record the Quigleys' phone conversations, and they spoke to Towbin on an almost daily basis, purporting to inform the ADL about the "campaign of harassment" which the Quigleys were waging against them. (*Id.*, Statement of Additional Disputed Facts ¶ 44; *admitted at* ADL and Rosenthal's Reply Br. in Supp. of Their Mot. for Summ.J. re: First Amendment, Reply Concerning Undisputed Facts ¶ 55 [filed Dec. 4, 1998] [hereinafter "Defs.' First Amendment Reply"].) Towbin referred the Aronsons to attorney Gary Lozow, who, in turn, brought in another lawyer, Stewart Kritzer, to meet with the Aronsons and other ADL representatives. (ADL and Rosenthal's Mot. for Summ.J. re: First Amendment, Statement of Undisputed Material Facts ¶ 5 [filed Aug. 12, 1998] [hereinafter "Defs.' First Amendment Br."]; *admitted in pertinent part at* Pls.' Resp. Facts, The Quigleys' Resp. to Statement of Undisputed Material Facts in Mot. for Summ.J. re: First Amendment ¶ 5.)

On December 6, 1994, the Aronsons filed a complaint in this court against the Quigleys in Civil Action No. 94–N–2782, alleg-

ing ethnic intimidation and violation of their civil rights (the "civil-rights action"). (Defs.' Constitutional Br., Statement of Undisputed Material Facts ¶ 1; *admitted in pertinent part at* Pls.' Resp. Facts, The Quigleys' Resp. to Statement of Undisputed Material Facts in Mot. for Summ.J. re: Claim of Violation of Quigleys' Constitutional Rights ¶ 1; *see also* Aronsons' Compl.) Kritzer and Lozow represented the Aronsons in the civil-rights action. The Aronsons' complaint consisted almost entirely of references to excerpts from the intercepted telephone conversations of the Quigleys. (Pls.' Resp. Facts, Statement of Additional Disputed Facts ¶ 90; *admitted at* Defs.' First Amendment Reply, Reply Concerning Undisputed Facts ¶ 90.) On December 20, 1994, the Aronsons amended their complaint. (Verified [First] Am. Compl. for Injunctive Relief, Damages[,] and Jury Demand ¶¶ 2–3 [filed Dec. 20, 1994] [hereinafter "Aronsons' Am. Compl."].)

On December 6, 1994, after the civil-rights action had been filed, *Denver Post* reporter Peter Chronis contacted Rosenthal and asked his opinion about the civil-rights action. (Defs.' First Amendment Br., Statement of Undisputed Material Facts ¶ 8; *admitted at* Pls.' Resp. Facts, The Quigleys' Resp. to Statement of Undisputed Material Facts in Mot. for Summ.J. re: First Amendment ¶ 8.) Later that same day, Rosenthal, Towbin, Kritzer, and the Aronsons met to discuss a strategy for dealing with the press. (Pls.' Resp. Facts, Statement of Additional Disputed Facts ¶ 95.) Subsequent to that meeting, the ADL issued a "Press Advisory" announcing a December 7, 1994, press conference "to present information about a major case of anti-[S]emitism and harassment in the Evergreen, Colorado area and the lawsuit which has resulted from that case." (*Id.*, Attach., Ex. KK [Press Advisory].) At that press conference, Rosenthal read a prepared "Opening Statement" and fielded questions from members of the media. (*Id.*, Attach., Ex. MM [Opening Statement].) Rosenthal's comments were extensively quoted in the media, and, on

December 7, 1994, Rosenthal was interviewed on Denver radio station KOA about the civil-rights action. (*Id.*, Statement of Additional Disputed Facts ¶ 122.) On December 9, 1994, the Jefferson County District Attorney's Office publicly announced that it was charging the Quigleys with the crime of ethnic intimidation. (*Id.*, Attach., Ex. BB [Paulter Dep. at 36].)

In January 1995, the Quigleys filed their answer to the Aronsons' amended complaint, denying that they conspired to intimidate the Aronsons or violate the Aronsons' rights. (Answer of Defs. [ ] to Pls.' Verified First Am. Compl. and [the Quigleys'] First Am. Countercls. Against [the Aronsons], Saul F. Rosenthal, and the [ADL] at 2 [filed Jan. 17, 1995].) The Quigleys maintained that, for reasons unknown to them, the Aronsons loathed them and engaged in a campaign of tortious and unlawful conduct against them. (*Id.* at 10.) According to the Quigleys, after enlisting the assistance of Rosenthal, the ADL, and "a transcription service" (later named as Defendant Legal–Temp., Inc., doing business as Attorneys Service Center, Inc. ["Legal–Temp"] ), the Aronsons illegally intercepted the Quigleys' private conversations, transcribed them, and edited them so as to falsely portray the Quigleys as anti-Semitic. (*Id.* at 19–24.) Thereafter, according to the Quigleys, the Aronsons, together with Rosenthal and the ADL, conducted a press conference wherein they publicly labeled the Quigleys anti-Semitic and accused them of planning vicious acts against the Aronsons. (*Id.* at 25–29.) In their amended counterclaims, the Quigleys asserted state-law tort counterclaims against the Aronsons, Rosenthal, and the ADL.

In addition, Mr. Quigley, on January 17, 1996, filed an amended complaint in a separate suit against the Aronsons, Civil Action No. 95–N–2916. (Pl. William J. Quigley's Am.Compl. and Demand for a Jury Trial [deemed filed Jan. 17, 1996].) Mr. Quigley claimed that the Aronsons, Rosenthal, the ADL, Kritzer, Lozow, and Legal–

Temp violated his rights under the Federal Wiretap Act by intercepting his and his family's private telephone conversations ("the wiretap action"). (*Id.*) On February 10, 1997, I granted a motion to consolidate the civil-rights action (94–N–2782) with the wiretap action (95–N–2916). (Order [filed Feb. 10, 1997].)

On April 7, 1997, the Aronsons filed a case against Kritzer in Jefferson County District Court, alleging that he had acted negligently and breached his fiduciary duties to them in regard to the civil-rights action. (Pls.' Resp. Facts, Attach., Ex. EE [Verified Compl. and Jury Demand, Case No. 97–CV–0902 (filed in Jefferson County District Court, Apr. 7, 1997) ].) On February 20, 1998, Kritzer, Lozow, the Aronsons, and the Quigleys reached a settlement agreement whereby Kritzer and Lozow paid monies to the Quigleys and the Aronsons, and all parties to the settlement agreed to release each other from liability for all federal and state civil claims between them ("the settlement"). (Pls.' Resp. Facts, Attach., Ex. EEE [Settlement Agreement and Mutual Release].)

The settlement, however, did not incorporate the Quigleys' claims against the ADL, Rosenthal, or Legal–Temp. On May 28, 1998, I deemed filed the Quigleys' consolidated complaint, which alleged thirty-one claims against Rosenthal, the ADL, and Legal–Temp. (Pls. William Quigley's and Dorothy Quigley's Consolidated Compl. and Demand for a Jury Trial [filed May 28, 1998] [hereinafter "Consolidated Compl."].) On November 4, 1998, I ordered the dismissal of Legal–Temp on the basis of the parties' stipulation to that effect. (Order of Dismissal with Prejudice [filed Nov. 4, 1998].)

In the context of this on-going litigation, the parties have engaged in numerous discovery disputes. At issue in this order, in addition to the dispositive motions outlined below, is defendants' motion seeking reconsideration of my order granting the Quigleys' motion to compel responses to their sixth request for production in their second set of interrogatories ("sixth request"). (Anti–Defamation League and Saul F. Rosenthal's Mot. for Recons. of the Ct.'s Ruling that ADL and Rosenthal are not Journalists or Mot. for Protective Order and Req. for Oral Argument [filed Aug. 3, 1998] .)

On August 12, 1998, defendants filed three motions for summary judgment on claims alleged by the Quigleys. First, defendants contend that several of the Quigleys' claims against them are impermissibly based upon speech protected under the First Amendment to both the Colorado and United States Constitutions. (ADL and Rosenthal's Mot. for Summ.J. re: First Amendment [filed Aug. 12, 1998].) Second, defendants argue that they may not be held liable for the acts of Kritzer and Lozow because Kritzer and Lozow were not acting as defendants' agents. (ADL and Rosenthal's Mot. for Summ.J. re: Agency [filed Aug. 12, 1998].) Finally, defendants assert that they may not be held liable for violating the Quigleys' constitutional rights because any wiretapping which occurred was not prohibited by law during the relevant period, and the Aronsons, who intercepted the Quigleys telephone conversations, were not state actors. (ADL and Rosenthal's Mot. for Summ.J. re: Claims for Violation of Constitutional Rights [filed Aug. 12, 1998].)

## ANALYSIS

### 1. Motion for Reconsideration

#### a. Rule 60(b)

Although the Federal Rules of Civil Procedure do not specifically allow for a motion for reconsideration, the court treats such a motion in one of two ways, depending upon when the motion is filed. *Hatfield v. Board of County Comm'rs for Converse County*, 52 F.3d 858, 861 (10th Cir.1995); *Van Skiver v. United States*, 952 F.2d 1241, 1243 (10th Cir.1991). The court considers a motion for reconsideration filed within ten days of the entry of judgment as one to alter or amend the judgment under rule 59(e) of the Federal

Rules of Civil Procedure. *Hatfield,* 52 F.3d at 861. The court construes such a motion filed more than ten days after entry of judgment as one seeking relief from the judgment under rule 60(b) of the Federal Rules of Civil Procedure. *Id.* In addition, while rule 59 refers only to motions to alter or amend judgments which have already been entered, rule 60(b) allows a court to "relieve a party ... from a final judgment, order, or proceeding." Fed. R.Civ.P. 60(b). Because defendants seek reconsideration of an order, not a final judgment, I consider their motion under rule 60(b).

■ Rule 60(b) of the Federal Rules of Civil Procedure provides that a court may relieve a party from an order "upon such terms as are just." *Id.* The rule enumerates six grounds for granting such a motion: (1) mistake, inadvertence, surprise, or excusable neglect; (2) newly discovered evidence; (3) fraud, misrepresentation, or misconduct; (4) void judgment; (5) satisfied or no longer equitable judgment; or (6) any other reasons justifying such relief. *Id.* A court "has substantial discretion in connection with a[r]ule 60(b) motion," *Pelican Prod. Corp. v. Marino,* 893 F.2d 1143, 1146 (10th Cir.1990), and the rule "gives the court a grand reservoir of equitable power to do justice in a particular case," *In re Gledhill,* 76 F.3d 1070, 1080 (10th Cir.1996) (quoting *Pierce v. Cook & Co.,* 518 F.2d 720, 722 [10th Cir.1975] [en banc] [internal quotations and citations omitted] ). Defendants ask me to reconsider my oral order granting the Quigleys' motion to compel responses to their sixth request in their second set of interrogatories and requests for production of documents. (Courtroom Mins. [July 23, 1998].)

The sixth request asked Rosenthal to produce all documents "concerning, referring, or relating to all complaints of anti-Semitism made to ADL's Mountain States office since January 1, 1990." (Pls.' Mot. to Compel Resp. to Pls. William Quigley's and Dorothy Quigley's Second Set of Interrogs. and Reqs. for Produc. of Docs. to Def. Saul F. Rosenthal, Ex. B [Def. Saul F. Rosenthal's Resps. to Pls. William J. Quigley's and Dorothy "Dee" Quigley's Second Set of Interrogs. and Reqs. for Produc. of Docs at 12 (hereinafter "Def.'s Resp. to Interrogs.") ] [filed July 2, 1998].) Rosenthal objected to the sixth request on the grounds that the information sought was protected under the newsperson privilege and was, further, overbroad, overly burdensome, and oppressive. (*Id.,* Ex. B [Def.'s Resp. to Interrogs at 12].) At a hearing regarding the Quigleys' motion to compel on July 23, 1998, I granted the motion with respect to, *inter alia,* the sixth request, on the grounds that defendants' *ipse dixit* assertion that ADL is a journalistic organization was insufficient to allow the privilege. (Tr. of Hr'g at 12–13 [July 23, 1998].) Defendants now reassert the argument that the ADL may be considered a journalistic organization for purposes of the privilege and that it need not produce the requested materials under the First Amendment to the United States Constitution and Colorado's journalists' privilege and shield law, Colorado Revised Statute § 13–90–119 (1998).

### b. Rule 501

■ The Quigleys contend that, under rule 501 of the Federal Rule of Evidence, I must apply Colorado law to defendants' claim of privilege. Rule 501 provides that, when a federal court hears a civil action, "with respect to an element of a claim ... as to which State law provides the rule of decision, the privilege of a witness ... shall be determined in accordance with State law." Fed.R.Evid. 501; *see also Star Editorial, Inc. v. United States Dist. Court,* 7 F.3d 856, 859 (9th Cir.1993) (applying California law pursuant to rule 501). Because the Quigleys claim that this evidence is relevant to demonstrate (1) the falsity of Rosenthal's statements and (2) "actual malice," or defendants' knowledge of that falsity, both state-law-defined elements of the Quigleys' defamation claims, I evaluate the claim of privilege under Colorado law. (Pls.' Opp'n to Defs. the Anti–Defamation League's and Saul F. Rosen-

thal's Mot. for Recons. of this Ct.'s Ruling that ADL and Rosenthal Are Not Journalists or Mot. for Protective Order at 11 [filed Sept. 2, 1998] [hereinafter "Pls.' Resp. to Mot. to Recons."].)

### c. Newsperson Privilege

Colorado Revised Statute § 13–90–119 provides for an evidentiary "privilege for [a] newsperson" except where the party seeking disclosure can demonstrate: "[1][t]hat the news information is directly relevant to a substantial issue involved in the proceeding; [2][t]hat the news information cannot be obtained by any other reasonable means; and [3][t]hat a strong interest ... outweighs the interests under the [F]irst [A]mendment to the United States [C]onstitution in not responding to a subpoena and of the general public in receiving news information." Colo.Rev. Stat. § 13–90–119(3)(a)–(c). The parties dispute vigorously whether or not ADL may be considered a "newsperson" or "journalist" for purposes of invoking this privilege. Section 13–90–119 defines "Newsperson" as "any member of the mass media and any employee or independent contractor of a member of the mass media who is engaged to gather, receive, observe, process, prepare, write, or edit new information for dissemination to the public through mass media." Id. § 13–90–119(3)(a). "Mass medium" is further defined as "any publisher of a newspaper or periodical...." Id. § 13–90–119(1)(c). It is undisputed that ADL publishes numerous periodicals, books, and pamphlets and regularly engages in news gathering activities. Therefore, I find that defendants have met their burden of demonstrating the ADL's status as a "newsperson."

This holding coheres with existing state and federal law. The Colorado Supreme Court in *Henderson v. Colorado*, 879 P.2d 383 (Colo.1994), held that a witness was *"acting as a 'newsperson'* when he piloted [a] helicopter," used to transport both police officers investigating an alleged criminal and a news photographer. *Id.* at 392 (emphasis supplied). The court reasoned that the witness was a newsperson not simply because he was an employee of a television news station, but also because, during the incident at issue, "he was *acting as a newsperson* as defined by subsection (1)(c) and not as a police agent." *Id.* at 392. Similarly, the Tenth Circuit has held that a documentary filmmaker, even though "he did not regularly engage in obtaining, writing, reviewing, editing[,] or otherwise preparing news," fell under the ambit of the federal common-law journalists' privilege to the extent that his investigative interviews formed the basis for his documentary film. *Silkwood v. Kerr–McGee Corp.*, 563 F.2d 433, 436–37 (10th Cir.1977). The court noted that "[t]he Supreme Court has not limited the privilege to newspaper reporting. It has in fact held that the press comprehends different kinds of publications which communicate to the public information and opinion." *Id.* at 437 (citing *Lovell v. City of Griffin*, 303 U.S. 444, 452, 58 S.Ct. 666, 669, 82 L.Ed. 949 [1938] ).

Considering the specific information sought to be withheld in response to the sixth request, I find that defendants are entitled to invoke the privilege with regard to their record of anti-Semitic complaints filed with the Mountain States' Office. Under the first prong of the statutory test, I find that the information which the Quigleys seek is not directly relevant to a substantial issue in this case. The Quigleys contend that the complaints to the ADL "bear directly upon essential elements of the Quigleys' defamation claims" because they prove the falsity and malice behind two of Rosenthal's allegedly defamatory statements. (Pls.' Resp. to Mot. to Recons. at 8, 10.) According to the Quigleys, Rosenthal announced at the December 7, 1994, press conference that the Quigleys had engaged in conduct which constituted " 'one of the most astonishing cases of anti-Semitic harassment [the Mountain States Office] has ever confronted.' " (*Id.* at 10.) The Quigleys also allege that Rosenthal subsequently stated on a radio talk show that the Quigleys' conduct

was " 'the worst that [Rosenthal had] seen in so many years, since the [Alan] Berg murder.' " (*Id.*)

I fail to see how, even if the Quigleys obtained copies of the complaints requested, they could prove the falsity of these statements of opinion which are, at worst, examples of mere "rhetorical hyperbole." *See Standing Comm. on Discipline of the U.S. Dist. Court for the Cent. Dist. of Cal. v. Yagman,* 55 F.3d 1430, 1438 (9th Cir. 1995) (holding that, because of First Amendment protections, "statements of 'rhetorical hyperbole' [are not] sanctionable . . . .") (citations omitted). "When the facts underlying a statement of opinion are disclosed, [the audience] will understand that they are getting the [speaker's] interpretation of the facts presented; they are therefore unlikely to construe the statement as insinuating the existence of additional, undisclosed facts." *Id.* at 1439 (citations omitted). The context of each of the alleged defamatory statements makes clear the basis for Rosenthal's opinion. The Quigleys themselves allege that Rosenthal's statement that "[t]his has been one of the most astonishing cases of anti-Semitic harassment our office has ever confronted," was immediately followed with this explanation: .

> The consistency and frequency of threats, sustained over months, makes this a very different kind of anti-Semitic incident. Unlike the more typical case of an isolated verbal or physical assault, what we have here are dozens of instances of attempts to intimidate, threaten and do harm to the Aronsons and to conspire with others in the neighborhood to do the same.

(Consolidated Compl. ¶ 39[b].) Similarly, Rosenthal's statement that the conduct was "the worst that [he had] seen in so many years, since the [Alan] Berg murder," lay within the following quotation:

> And, here we are basically a little over ten years later [after the Alan Berg assassination], and it's been the small stuff, you know, a few, a few encounters with Sean Slater and Klu [sic] Klux Klan. . . . But, but this is months of, of

effort on the part of the Quigleys to scheme and plot and plan and bring a variety of neighbors into the process and to drive a car at someone to try and frighten them and to nearly crash into them and to talk about dousing their kids and calling the police and, and putting false charges out there that the [Aronsons], that the Aronsons are doing one thing or another that is absolutely false, that's what makes it the worst that I've seen in so many years, since the Berg murder, because it's uh, it's so massive in the number of acts that the Aronsons, uh, that the Quigleys engaged in against the Aronsons.

(*Id.* ¶ 43[e].) Regarding the statement complained of, "it is plain that the speaker is expressing a subjective view, an interpretation, a theory, conjecture, or surmise, rather than claiming to be in possession of objectively verifiable facts." *Yagman,* 55 F.3d at 1441. Thus, I find that release of the complaints regarding other incidents of anti-Semitic conduct could not demonstrate the truth or falsity of Rosenthal's assertions, nor could it reveal any actual malice on his part.

The test for exceptions to Colorado's newsperson privilege statute is phrased in the conjunctive. Thus, the Quigley's failure to prove the first prong of the test obviates the need for further analysis. I therefore grant defendants' motion for reconsideration and further hold that defendants need not produce the documents requested under the sixth request.

### 2. Motions for Summary Judgment: Legal Standard

Under rule 56(c) of the Federal Rules of Civil Procedure, the court may grant summary judgment where "the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and the . . . moving party is entitled to judgment as a matter of law." Fed.R. Civ.P. 56(c); *see Anderson v. Liberty Lobby, Inc.,* 477

U.S. 242, 250, 106 S.Ct. 2505, 2511, 91 L.Ed.2d 202 (1986); *Concrete Works of Colorado, Inc. v. City & County of Denver,* 36 F.3d 1513, 1517 (10th Cir.1994). The moving party bears the initial burden of showing an absence of evidence to support the nonmoving party's case. *Celotex Corp. v. Catrett,* 477 U.S. 317, 325, 106 S.Ct. 2548, 2554, 91 L.Ed.2d 265 (1986). "Once the moving party meets this burden, the burden shifts to the nonmoving party to demonstrate a genuine issue for trial on a material matter." *Concrete Works, Inc.,* 36 F.3d at 1518 (citing *Celotex Corp.,* 477 U.S. at 325, 106 S.Ct. at 2554). The nonmoving party may not rest solely on the allegations in the pleadings, but must instead designate "specific facts showing that there is a genuine issue for trial." *Celotex Corp.,* 477 U.S. at 324, 106 S.Ct. at 2553; *see* Fed.R.Civ.P. 56(e). The court may consider only admissible evidence when ruling on a summary judgment motion. *See World of Sleep, Inc. v. La–Z–Boy Chair Co.,* 756 F.2d 1467, 1474 (10th Cir.1985). The factual record must be viewed in the light most favorable to the nonmoving party. *Concrete Works, Inc.,* 36 F.3d at 1518 (citing *Applied Genetics Int'l, Inc. v. First Affiliated Securities, Inc.,* 912 F.2d 1238, 1241 [10th Cir.1990]).

### 3. *Motion for Summary Judgment: First Amendment*

■ Defendants move for summary judgment in their favor on (1) the defamation claims, (2) the wiretap claims involving disclosure, and (3) the remaining common-law tort claims, arguing that all of these claims are based upon speech protected under the First Amendment to both the Colorado and United States Constitutions. (Defs.' First Amendment Br.) Generally, to prove a cause of action for defamation, a plaintiff must establish: (1) a defamatory statement; (2) published to a third party; (3) with fault amounting to at least negligence on the part of the publisher; and (4) either actionability of the statement irrespective of special damages or the existence of special damages to plaintiff caused by publication. *Williams v. District*

*Court, Second Judicial Dist., City & County of Denver,* 866 P.2d 908, 912 n. 4 (Colo.1993) (en banc) (citations omitted). If the plaintiff in a defamation action is a "public figure," however, the third element of a defamation claim requires proof that the defendant published the defamatory statement with actual malice, that is, with knowledge of its falsity or in reckless disregard of its truth or falsity. *New York Times Co. v. Sullivan,* 376 U.S. 254, 84 S.Ct. 710, 11 L.Ed.2d 686 (1964); *see also Lewis v. McGraw–Hill Broad. Co., Inc.,* 832 P.2d 1118, 1122–23 (Colo.App.1992) (citing same).

■ The Supreme Court has left it to the states to decide whether this heightened standard of fault should also be applicable to instances where the allegedly defamatory statement relates not to a public figure, but to a private figure involved in a matter of "public concern." "[S]o long as they do not impose liability without fault, the [s]tates may define for themselves the appropriate standard of liability for a publisher or broadcaster of defamatory falsehood injurious to a private individual." *Gertz v. Robert Welch, Inc.,* 418 U.S. 323, 347, 94 S.Ct. 2997, 3010, 41 L.Ed.2d 789 (1974). Colorado has chosen to adopt the Supreme Court's standard of actual malice, including the definition of "reckless disregard" for truth or falsity, for cases involving public officials, public figures, and matters of public or general concern. *Diversified Management, Inc. v. Denver Post, Inc.,* 653 P.2d 1103, 1106 (Colo.1982) (en banc). Thus, where the plaintiff is a public figure by virtue of his or her involvement in a matter of public concern, i.e., a "limited-purpose public figure," the First Amendment imposes greater protection for the speech of the defendant than it would for a purely private figure. *See Gertz,* 418 U.S. at 351, 94 S.Ct. at 3013 (defining a limited-purpose public figure in contrast to an all-purpose or general public figure).

### a. Public Concern Doctrine

 The question of whether an individual is a public figure—limited—or all-purpose—and is therefore subject to the actual malice standard is one of law, not fact. Restatement (Second) of Torts § 580A (1977). Here, there is no dispute that the Quigleys are not general purpose public figures. To establish that a defamation or libel plaintiff is a limited-purpose public figure, on the other hand, a defendant bears the burden of showing that:

> (1) public controversy existed on a specific question having ramifications for nonparticipants; (2) the plaintiff had a significant role in the controversy, either by voluntarily attempting to affect the outcome or by being drawn into the controversy and assuming a central role; and (3) the alleged defamation was germane to the plaintiffs participation in the controversy.

*Clyburn v. News World Communications, Inc.,* 705 F.Supp. 635, 639 (D.D.C.1989), *aff'd,* 903 F.2d 29 (D.C.Cir.1990) (citing *Waldbaum v. Fairchild Publications, Inc.,* 627 F.2d 1287, 1296–98 [D.C.Cir.1980] ).

 With regard to the first prong of this standard, it is plain that the subject matter of a defamatory statement must have existed as a public concern prior to any controversy engendered by the allegedly defamatory comments. *Waldbaum,* 627 F.2d at 1297 (citation omitted). Furthermore, "[t]he newsworthiness of an event is not the measuring stick for identifying public controversy" to determine whether those individuals involved may be considered public figures. *Dameron v. Washington Magazine, Inc.,* 779 F.2d 736, 742 (D.C.Cir.1985). Thus, because of the broad array of events which may invoke the interest of the media, courts have made clear that "essentially private concerns or disagreements do not become public controversies simply because they attract attention." *Waldbaum,* 627 F.2d at 1296 (citing *Time, Inc. v. Firestone,* 424 U.S. 448, 454–55, 96 S.Ct. 958, 965–66, 47 L.Ed.2d 154 [1976] ). In this vein, the Supreme Court has stated that "those charged with defamation cannot, by their own conduct, create their own defense by making the claimant a public figure." *Hutchinson v. Proxmire,* 443 U.S. 111, 135, 99 S.Ct. 2675, 2688, 61 L.Ed.2d 411 (1979); *see also Diversified Mgmt., Inc.,* 653 P.2d at 1107 (quoting same).

 In this case, I find that defendants have not met their burden to demonstrate that the Quigleys were limited-purpose public figures when Rosenthal made the bulk of his allegedly defamatory statements, at the press conference and as an interviewee on KOA radio. Most importantly, it is undisputed that the Quigleys did not "thrust [themselves] or [their] views into public controversy to influence others." *Hutchinson,* 443 U.S. at 135, 99 S.Ct. at 2688. Indeed, the bulk of the allegedly defamatory statements were based on excerpts of private telephone conversations between the Quigleys and other third parties which the Aronsons surreptitiously intercepted. (*See, e.g.,* Pls.' Resp. Facts, Attach., Ex. MM [Opening Statement].) In this regard, the Quigleys' position contrasts to that of the plaintiffs in *Diversified Management, Inc.,* in which the court found that alleged widespread and ongoing land-development schemes of questionable propriety constituted a matter of public concern strictly because the matter still had the potential to affect future buyers of lots which were yet-unsold. *Id.,* 653 P.2d at 1108. Similarly, in *Lewis,* the court found a matter of public interest existed in part because the plaintiff filed a civil lawsuit to "protest[ ] racially motivated policies of a *large retail establishment* which allegedly had been directed against her." *Id.,* 832 P.2d at 1122 (emphasis supplied). Thus, in *Lewis,* in addition to the fact that the plaintiff had essentially thrust herself into a public debate through her lawyer's public commentary at a local meeting, the court relied on the fact that resolution of the issue could have an affect on other patrons of a commercial entity. *Id.*

At the time of the allegedly defamatory statements in this case, Rosenthal had received merely one unsolicited request from the press based on the filing of the lawsuit, as compared to the "immediate and widespread publicity from the various media organizations" which the filing of the underlying lawsuit in *Lewis* prompted. *Id.,* 832 P.2d at 1120. It was defendants' decision (arguably along with the Aronsons'), not the Quigleys', to amplify the matter by calling a press conference under the ADL name. Because, at the time of the press conference on December 7, 1994—the original publication of the allegedly defamatory statements—the dispute between the Aronsons and the Quigleys was still essentially private, I conclude that the Quigleys were no public figures subject at that point, and Rosenthal's statements about them are, accordingly, not subject to the higher standard.

██ My inquiry, however, does not end there. As even the Quigleys acknowledge, at some point, the dispute between the Aronsons and Quigleys became a matter of public concern. (*See* Pls.' Combined Mem. in Opp'n to Defs. ADL's and Rosenthal's Several Mots. for Summ.J. at 14–15 n. 6. [filed Oct. 6, 1998] [hereinafter "Pls.' Resp."].) Extensive media coverage of all the subsequent incidents and proceedings involving the Quigleys and Aronsons, as well as calls of support for the Aronsons from concerned citizens around the state, are a fair measure that eventually, the dispute took on a life of its own and became the sort of issue "about which information is needed or is appropriate." *Lewis,* 832 P.2d at 1121 (citing *Cox Broadcasting Corp. v. Cohn,* 420 U.S. 469, 492, 95 S.Ct. 1029, 1045, 43 L.Ed.2d 328 [1975]). Admittedly, the moment at which this transformation occurred is difficult to pinpoint. It is plain, in any event, that after the Jefferson County District Attorney's Office *publicly* announced on December 9, 1994, that it was pressing criminal charges against the Quigleys, the dispute was a matter of public interest.

The Supreme Court has articulated that "[t]he commission of crime, prosecutions resulting from it, and judicial proceedings arising from the prosecutions [ ] are without question events of legitimate concern to the public and consequently fall within the responsibility of the press to report the operations of government." *Cox Broadcasting Corp.,* 420 U.S. at 492, 95 S.Ct. at 1045. Although the claim in *Cox Broadcasting Corp.* concerned an alleged invasion of privacy rather than a defamation action, the Court's logic in that context is equally applicable here. Thus, with regard to statements made after the district attorney's announcement on December 9, 1994, the Quigleys may be considered private individuals involved in a matter of public interest. Accordingly, any alleged defamation or slander which occurred after that announcement must be evaluated under the actual malice standard. (*See, e.g.,* Consolidated Compl. ¶ 65 [stating that "(i)mmediately after the Jefferson County authorities publicly filed their criminal charges against the Quigleys ... Rosenthal again spoke to the press about the Quigleys....]", ¶¶ 70, 76, 82, 86 [alleging that defendants' false accusations "were disseminated throughout Colorado and nationally and were re-published in the media for months after (defendants) initially disseminated the (Opening Statement)"]). All earlier statements, including those at the press conference and on KOA radio, are analyzed pursuant to the lower, private-figure standard.

### b. *Privilege Defenses*

Defendants argue that, even if they published statements defaming the Quigleys, they should not be held liable for doing so because their statements were (1) protected under the judicial proceedings privilege, and (2) statements of opinion, and therefore not defamatory as a matter of law. (Defs.' First Amendment Br. at 15–18.) I consider each of these arguments in turn.

### i. Judicial Proceedings Privilege

■ According to the Restatement Second of Torts:

[t]he publication of a defamatory matter concerning another in a report of an official action or proceeding or of a meeting open to the public that deals with a matter of public concern is privileged if the report is accurate and complete or a fair abridgement of the occurrence reported.

Restatement (Second) of Torts § 611 (1977). Defendants argue that "most jurisdictions" have extended the privilege to cover statements made regarding court pleadings, even if they have not yet been the subject of any judicial action. (Defs.' First Amendment Reply at 29–30.) Indeed, although defendants have accurately cited the law with regard to some jurisdictions, *see, e.g., Kurata v. Los Angeles News Publishing Co.*, 4 Cal.App.2d 224, 40 P.2d 520 (1935); *Johnson v. Johnson Publishing Co.*, 271 A.2d 696 (D.C.1970); *Newell v. Field Enterprises Inc.*, 91 Ill.App.3d 735, 47 Ill.Dec. 429, 415 N.E.2d 434 (1980); *Reilly v. Gillen*, 176 N.J.Super. 321, 423 A.2d 311 (1980), defendants have disregarded the law of Colorado. Colorado courts have consistently adhered to the original Restatement rule which precludes a defamation defendant from invoking the judicial proceedings privilege on the basis of a filed complaint alone. *See Towles v. Meador*, 84 Colo. 547, 272 P. 625 (1928) (denying qualified privilege based only on initial filing of complaint of fraud); *Switzer v. Anthony*, 71 Colo. 291, 206 P. 391 (1922) (noting that publication of a legal proceeding is qualifiedly privileged only after proceeding has gone into court and thereby become public); *Meeker v. Post Printing & Publ'g Co.*, 55 Colo. 355, 135 P. 457 (1913) (holding that publication of libelous charges set forth in complaint and affidavits filed in a civil suit before trial or any other action taken on pleadings is not privileged).

■ Where Colorado Supreme Court precedent on a state-law issue exists, I am bound to follow it. *Fransen v. Conoco,*

*Inc.*, 64 F.3d 1481 (10th Cir.1995). Because the alleged defamatory statements which Rosenthal made at the press conference and on KOA radio occurred immediately after the Aronsons' complaint was filed and before any judicial action could have been taken thereon, I find that defendants' statements do not fall under this protective shield.

### ii. Opinion Privilege

■ Defendants also argue that they should not be held liable for several of the allegedly defamatory statements because they merely amount to opinion. Indeed, "[w]hile false statements of fact and opinions that reasonably imply undisclosed defamatory facts as their premise are actionable, pure opinion is not." *Sall v. Barber*, 782 P.2d 1216, 1218 (Colo.Ct.App. 1989). Because the determination of whether a particular statement is an opinion arises as a matter of law, the Colorado Supreme Court has outlined a three-factor analysis which instructs a court to consider: (1) whether the statement is "cautiously" phrased in terms of "apparency"; (2) how the entire statement, "not just the objectionable word or phrase," appears in context; and (3) what the nature of the circumstances surrounding the statement is, including the medium through which it is published and its audience. *Id.* at 1217 (citing *Burns v. McGraw Hill–Broad., Inc.*, 659 P.2d 1351 [Colo.1983] ). In particular, defendants contend that the following statements are not defamatory as a matter of law because they are opinions:

1. "This has been one of the most astonishing cases of anti-Semitic harassment our office has ever confronted. The consistency and frequency of threats, sustained over months, makes this a very different kind of anti-Semitic incident. Unlike the more typical case of an isolated verbal or physical assault, what we have here are dozens of instances of attempts to intimidate, threaten and do harm to the Aronsons and to

conspire with others in the neighborhood to do the same."

2. "The Aronson family has lived in fear of the Quigleys these last several months. And for good reason. [The] Quigley[s] have proven themselves to be dangerous neighbors."

3. "This case, what makes this case particularly unique is the volume of the anti-Semitic activity . . . ."

4. "And, here we are basically a little over ten years later [after the Alan Berg assassination], and it's been the small stuff, you know, a few, a few encounters with Sean Slater and Klu [sic] Klux Klan. . . . But, but this is months of, of effort on the part of the Quigleys to scheme and plot and plan and bring a variety of neighbors into the process and to drive a car at someone to try and frighten them and to nearly crash into them and to talk about dousing their kids and calling the police and, and putting false charges out there that the [Aronsons], that the Aronsons are doing one thing or another that is absolutely false, that's what makes it the worst that I've seen in so many years, since the Berg murder, because it's uh, it's so massive in the number of acts that the Aronsons, uh, that the Quigleys engaged in against the Aronsons."

5. ". . . . it's not a two-sided story. . . . The Aronsons haven't done anything, they simply moved into the house, and within weeks thereafter the Quigleys started this effort to get them thrown out . of the neighborhood because they didn't want, as they referred to them, I can't even use the term because it's the 'f' word, those 'f' Jews in their community. And, um, that strikes me as, as one of those quest, questions that doesn't have two sides to it."

(Defs.' First Amendment Br. at 16 [quoting Pls.' Resp. Facts, Attach., Ex. MM (Opening Statement), Ex. SS (Greg Dobbs Program broadcast, Dec. 7, 1995) ].)

I have already noted that, in the context of the newsperson's privilege, two of Rosenthal's statements—that the Quigleys had engaged in conduct which constituted "one of the most astonishing cases of anti-Semitic harassment [the Mountain States Office] has ever confronted" and that the Quigleys' conduct was "the worst that [Rosenthal had] seen in so many years, since the [Alan] Berg murder"—were reasonably construed as unactionable statements of opinion, not fact. Other statements, such as "[t]he Aronson family has lived in fear of the Quigleys these last several months. And for good reason. [The] Quigley[s] have proven themselves to be dangerous neighbors," ". . . what makes this case particularly unique is the volume of the anti-Semitic activity . . . ," and ". . . it's not a two-sided story," might also be "reasonably . . . perceived as rhetorical hyperbole rather than fact," *Sall,* 782 P.2d at 1217.

I find, however, that there are some statements even within the defendants' claimed opinions, which may properly be characterized as actionable defamatory allegations. For instance, some of the facts which appear to underlie the statements of opinion in the passages above could be evaluated in terms of their veracity or .falsity. Thus, even as Rosenthal offered the opinion in the first passage above that this was "one of the most astonishing cases of anti-Semitic harassment [his] office has ever confronted," he based the opinion in part on the assertion that ". . . what we have here are dozens of instances of attempts to intimidate, threaten and do harm to the Aronsons and to conspire with others in the neighborhood to do the same." (Pls.' Resp. Facts, Attach., Ex. MM [Opening Statement].) Even if, as defendants argue, the use of the word "dozens" is non-defamatory hyperbole, the Quigleys rightfully argue that whether or not the Quigleys attempted to intimidate or threaten the Aronsons is capable of being proven true or false. Similarly, the bulk of Rosenthal's fourth statement above, adumbrating alleged activities of the Quigleys, provides facts which may be considered defamatory. Finally, the statement that "[t]he Aronsons haven't done

anything, they simply moved into the house...." could also be understood as an assertion of fact. *NBC Subsidiary (KCNC–TV), Inc. v. Living Will Ctr.*, 879 P.2d 6, 10 (Colo.1994).

Given that even defendants do not argue that every one of their allegedly defamatory statements was mere opinion, it is not entirely clear to me what purpose is served by addressing a relatively small number of the factual allegations against defendants in the summary judgment context. (*Compare* Defs.' First Amendment Br. at 16 [listing statements which defendants allege are not defamatory as a matter of law] *with* Pls.' Resp. Facts, Attach., Ex. MM [Opening Statement] [alleging twenty-one defamatory statements], Ex. SS [Greg Dobbs Program broadcast, Dec. 7, 1995] [alleging forty-two defamatory, statements].) Having culled out the factual—and therefore, potentially defamatory statements—from the five statements which defendants cite as "mere opinion," however, I can agree that the remaining parts of the above passages are not actionable as defamation. I am nonetheless left with an enormous number of defamatory, factual statements to consider in terms of defendants' negligence.

### c. Defamatory Communications

#### i. Negligence: Statements About Private Individuals

 Having established that defendants made statements prior to December 9, 1994, which are more than mere opinions, I now evaluate whether a reasonable juror could find that these statements were negligently made. "One who publishes a false and defamatory communication concerning a private person ... is subject to liability, if, but only if, he (a) knows that the statement is false and that it defames the other, (b) acts in reckless disregard of these matters, or (c) acts negligently in failing to ascertain them." Restatement (Second) of Torts § 580B (1977). Interestingly, neither of the parties raises the issue of whether defendants acted negligently in making statements about the Quigleys, concentrating instead on wheth-

er or not defendants' statements were made with actual malice. Based on my own review of the record, however, I find that the Quigleys have presented sufficient evidence of defendants' negligence to survive summary judgment on all of their defamation-based claims.

 In arguing that defendants acted with actual malice, the Quigleys offer several reasons for finding that defendants acted at least negligently in publishing defamatory statements about the Quigleys. First, I find that the Quigleys have adduced sufficient evidence that defendants failed to reasonably investigate before making public comments which may have denigrated the Quigleys. Failure to investigate obvious sources of refutation or corroboration of statements, especially when there is no time-pressure on their publication, may indicate not only negligence, but the higher standard of actual malice. *Burns*, 659 P.2d at 1362.

Here, it is undisputed that defendants called a press conference to speak about the dispute between the Aronsons and the Quigleys without speaking to any third party such as the Quigleys or other neighbors, to confirm, deny, or expand upon the information contained within the tape recordings. Further, neither Rosenthal himself nor any member of the ADL staff listened to the contents of the tapes, (Pls.' Resp. Facts, Attach., Ex. R [Rosenthal Dep. at 160–61]), but Rosenthal nonetheless attested intentionally and publicly to the "non-controvertible" [sic], "compelling," and "overwhelming" evidence which the tapes provided, (*id.*, Attach., Ex. SS [Greg Dobbs Program broadcast, Dec. 7, 1995]). Aside from the contents of the Aronsons' complaint, Rosenthal's only source of information concerning the dispute between the Aronsons and the Quigleys came from Towbin, who received only oral information directly from the Aronsons. (*Id.*, Statement of Additional Disputed Facts ¶¶ 101–02.) I find that a reasonable jury could determine that Rosenthal's broad, extensive,

and public assertions were negligently made in light of this arguably limited research base. Indeed, Rosenthal himself suggests that he may not have spoken in sufficiently careful terms when he made some of his public statements about the Quigleys. With regard to his statement that the Quigleys were responsible for "dozens" of attempts to intimidate, threaten, and do harm to the Aronsons, for instance, Rosenthal acknowledged that "in retrospect, ['dozens'] probably overstates the number that [he] thought was taking place at that time." (*Id.*, Attach., Ex. R [Rosenthal Dep. at 577–78].) A reasonable juror could, upon hearing such facts, determine that Rosenthal had not acted with due care in making such an allegation.

In sum, I find that the Quigleys have met their burden to sustain claims against defendants for defamation, claims involving disclosure of material obtained through wiretapping, and other torts based on defamatory statements. I must therefore deny defendants' motion for summary judgment on first amendment grounds insofar as it concerns statements made before the dispute between the Aronsons and the Quigleys became a matter of public concern.

### ii. Actual Malice: Statements About Private Individuals in Public Controversy

As noted above, defamatory incidents which occurred after the district attorney's office announced its criminal charges against the Quigleys are evaluated under the higher, actual malice standard. Similar to allegations of their complaint referred to above, the Quigleys declare in their compendium of facts for this order that "Rosenthal and ADL continued to make false and defamatory statements about the Quigleys to the media during December, 1994, and into 1995 and beyond." (*Id.*, Statement of Additional Disputed Facts ¶ 127.) The Quigleys, however, offer no citation for this asserted fact, and therefore, I cannot just deem it admitted or otherwise undisputed. The Quig-

leys do allege, however, facts and evidence concerning two statements which were made after December 9, 1994, which they suggest constitute actionable defamation: (1) a letter from two ADL national officers which "continu[ed] to smear the Quigleys as persons guilty of anti-Semitic conduct"; and (2) ADL's statement apparently responding to the district attorney's announcement that it was filing criminal charges against the Quigleys for ethnic intimidation. (*Id.*, Statement of Additional Disputed Facts ¶¶ 135, 139.) I consider each of these statements in turn to determine whether it provides a basis for a defamation claim.

#### (1). Letter to ADL Board

■■■■ Regardless of defendants' level of fault in issuing this letter, I find that none of the statements within it is capable of a defamatory meaning. "A communication is defamatory if it tends so to harm the reputation of another as to lower him in the estimation of the community or to deter third persons from associating or dealing with him." Restatement (Second) of Torts § 559 (1977). "The question of whether or not the meaning of a particular communication is defamatory is one for the court. . . ." W. Page Keeton, et al., *Prosser and Keeton on Torts* § 111, at 482 (West 5th ed.1984); *see also Pope v. Chronicle Pub. Co.*, 95 F.3d 607, 613 (7th Cir.1996) (quoting same). Thus, a district court may grant summary judgment on a defamation claim where the statement at issue is not "reasonably capable of a defamatory meaning." *Clark v. American Broad. Cos., Inc.*, 684 F.2d 1208, 1214 (6th Cir.1982) (citation omitted).

■■■ In December 1995, ADL's national chairman and national director sent a letter to their board members concerning developments in the dispute between the Aronsons and the Quigleys. (Pls.' Resp. Facts, Attach., Ex. DDD [Letter from Strassler and Foxman to Board Member(s) of 12/18/95].) The letter, taken as a whole, concerns ADL's role in the dispute and its assurance to board members that, while

court orders prevented the ADL from speaking publicly about the matter, the ADL was concerned about the impact of the events on Colorado and ADL community. (*Id.*, Attach., Ex. DDD [Letter from Strassler and Foxman to Board Member of 12/18/95].) "The letter refers to the Quigleys only twice, stating that (1) the Jefferson County District Attorney's Office entered into a settlement agreement with the Quigleys, and (2) the Quigleys expanded their original claims against the Aronsons and [ ] Rosenthal to include ADL, [ ] Lozow, and [ ]Kritzer." (*Id.*, Attach., Ex. DDD [Letter from Strassler and Foxman to Board Member of 12/18/95].) No reasonable juror could deem these statements to be harmful to the Quigleys' reputation under any standard of fault. Accordingly, I find that the contents of this letter may not, as a matter of law, be considered a basis for any defamation or defamation-based claim.

### (2). *Press Release*

In the second alleged instance of actionable defamation following the district attorney's December 9, 1994, announcement that it was filing criminal charges against the Quigleys, the Quigleys cite a statement to the press, apparently issued by ADL in response to the district attorney's announcement. Although there is no information or evidence concerning the manner and extent to which it was released, the statement itself reads:

> Evidently the Jefferson County District Attorney believes there is sufficient evidence to prove the Quigleys guilty of criminal behavior. Under our system of law it remains for a court to make the judgment about the strength of that evidence. If the court agrees with the District Attorney then it affirms ADL's strong belief that the kind of behavior the Quigley's [sic] have been accused of has no place in our society.

(*Id.*, Attach., Ex. XX [Statement on Criminal Prosecution].) Unlike the letter to the ADL board members, this statement could deter people from choosing to associate or deal with the Quigleys because it indicates that the Quigleys have acted in ways which could be considered criminal. It is, therefore, the only one of defendants' statements which I must examine through the actual malice lens.

To demonstrate actual malice, a plaintiff must demonstrate that the defendant in fact entertained serious doubts as to the truth of the statement or acted with a high degree of awareness of its probable falsity. *St. Amant v. Thompson,* 390 U.S. 727, 731, 88 S.Ct. 1323, 1325, 20 L.Ed.2d 262 (1968). Neither a failure to fully (or reasonably) investigate nor a failure to recognize the import of the consequences of publication for a defendant constitutes actual malice or bad faith. *Id.* at 733, 88 S.Ct. at 1326. Nonetheless, the Court in *St. Amant* noted that a defendant in a defamation action brought under the actual malice standard cannot "automatically insure a favorable verdict by testifying that he published with a belief that the statements were true. The finder of fact must determine whether the publication was indeed made in good faith." *Id.*, 390 U.S. at 732, 88 S.Ct. at 1326. As examples of bad faith, the Court offers the rather extreme examples of a defendant who has wholly fabricated the statement or relied on an informant whose veracity is obviously dubious. *Id.* A public-figure plaintiff must establish actual malice by clear and convincing evidence at the summary judgment stage, just as at trial, to defeat summary judgment. *Anderson,* 477 U.S. at 255, 106 S.Ct. at 2513.

Although the Quigleys do not argue about defendants' actual malice surrounding this particular statement, I find that they would nonetheless be unable to demonstrate this high standard of fault on the part of defendants. The record in this case is not only devoid of material manifesting a reckless disregard of the truth or falsity of this statement, but also bears significant evidence that this statement is a truthful account of recent events, i.e., the district attorney's announcement and the court proceedings which the announcement

would initiate. To the extent that this press statement incorporates ADL's opinion that "the kind of behavior [of which] the Quigley's [sic] have been accused [ ] has no place in our society," such a statement is also unactionable. Unlike earlier statements which offered facts and condemnation regarding the Quigleys' conduct, this statement does not attribute any acts to the Quigleys themselves. It is, therefore, a privileged statement of opinion, "phrased in terms of 'apparency.'" *Sall,* 782 P.2d at 1217. Because the Quigleys have not demonstrated the falsity of this statement, much less the actual malice of its publisher, the press release issued after the district attorney's December 7, 1994, announcement about the charges against the Quigleys is not a defamatory statement. In light of this finding and that concerning the letter to ADL board members examined above, I find that the Quigleys have offered no basis for finding that defendants published any defamatory statements on or after December 9, 1994, even though they may have negligently made defamatory statements about the Quigleys prior to that point.

### 4. *Motion for Summary Judgment: Violation of Constitutional Rights*

■ Section 1983 provides:

Every person, who, under color of any statute, ordinance, regulation, custom, or usage, of any State or Territory or the District of Columbia, subjects, or causes to be subjected, any citizen of the United States or other person within the jurisdiction thereof to the deprivation of any rights, privileges, or immunities secured by the Constitution and laws, shall be liable to the party injured in an action at law, suit in equity, or other proper proceeding for redress. . . .

42 U.S.C.A. § 1983. To establish a claim under section 1983, then, "a plaintiff must allege (1) deprivation of a federal [or constitutional] right by (2) a person acting under color of state law." *Watson v. City of Kansas City, Kan.,* 857 F.2d 690, 694 (10th Cir.1988) (citing *Gomez v. Toledo,* 446 U.S. 635, 640, 100 S.Ct. 1920, 1923, 64

L.Ed.2d 572 [1980] ). More specifically, to prevail on their section 1983 claims, the Quigleys must show that defendants acted in reckless disregard of or deliberate indifference to the known or obvious consequences of their actions. *Bd. of County Comm'rs of Bryan County, Okla. v. Brown,* 520 U.S. 397, 117 S.Ct. 1382, 1390–91, 137 L.Ed.2d 626 (1997); *City of Canton v. Harris,* 489 U.S. 378, 388, 109 S.Ct. 1197, 1204, 103 L.Ed.2d 412 (1989).

The parties agree that the Federal Wiretap Act embodies the federal rights at issue in this case. The Federal Wiretap Act generally proscribes the warrantless, non-consensual interception of "wire," "oral," and "electronic" communications. *See* 18 U.S.C.A. § 2511(1)(a). The statute also makes it unlawful for any person to intentionally "disclose" or "use" the "contents of any wire, oral, or electronic communication" when such person knows or has reason to know that the information was illegally intercepted. *See id.* § 2511(1)(c)–(d). Defendants assert that the Quigleys may not maintain a section 1983 claim that defendants violated their constitutional right to be free from unlawful searches and seizures because (1) the Quigleys had no reasonable expectation of privacy to protect their cordless phone communications under the Federal Wiretap Act, and (2) defendants were not acting under color of state law. (Defs.' Constitutional Br. at 2.)

■ The parties focus first on whether or not the Quigleys' recorded cordless phone conversations fall under the auspices of the Federal Wiretap Act. Prior to October 25, 1994, the Federal Wiretap Act defined the term "wire communication" as:

any aural transfer made in whole or in part through the use of facilities for the transmission of communications by the aid of wire, cable, or other like connection between the point of origin and the point of reception … *but such term does not include the radio portion of a cordless telephone communication that*

*is transmitted between the cordless telephone handset and the base unit .*

18 U.S.C.A. § 2510(1) (emphasis supplied). The pre-October 25, 1994, version of the Federal Wiretap Act similarly provided that the term "electronic communication" means:

any transfer of signs, signals, writing, images, sounds, data, or intelligence of any nature transmitted in whole or in part by a wire, radio, electromagnetic, photoelectronic or photooptical system . . . *but does not include —*
(A) *the radio portion of a cordless telephone communication that is transmitted between the cordless telephone handset and the base unit . . . .*

18 U.S.C.A. § 2510(12)(A) (emphasis supplied).

On October 25, 1994, however, Congress extended the coverage of the Federal Wiretap Act to *include* the radio portion of cordless-telephone communications by striking the above-referenced exceptions from sections 2510(1) and 2510(12)(A). *See* Communications Assistance for Law Enforcement Act of 1994, Pub.L. No. 103–414, § 202(a), 108 Stat. 4279, 4290 (Oct. 25, 1994); *see also In re Askin,* 47 F.3d 100, 102–03 (4th Cir.1995) (discussing amendment). Contrary to defendants' arguments, the amendments to the Federal Wiretap Act make plain that any interception of cordless-telephone conversations occurring on or after October 25, 1994, is impermissible.

■■ The issue of the Quigleys' pre-October 25, 1994, communications is more complicated. The Quigleys contend that these communications may be considered "oral communications," for which both the former and present versions of the Federal Wiretap Act provide some protection. (Pls.' Resp. at 54 n. 35.) Both versions of the Federal Wiretap Act define the term "oral communication" as:

any oral communication uttered by a person exhibiting an expectation that such communication is not subject to interception under circumstances justifying such expectation, but such term

does not include any electronic communication.

18 U.S.C.A. § 2510(2). Although it appears that the Tenth Circuit has not specifically addressed the issue, "[v]irtually every court to have faced the question of whether cordless phone conversations were oral communications under [section] 2510(2) answered in the negative." *In re Askin,* 47 F.3d at 103 (citing *United States v. Smith,* 978 F.2d 171, 174–76 [5th Cir. 1992]; *Tyler v. Berodt,* 877 F.2d 705, 706–07 [8th Cir.1989]; *U.S. v. Carr,* 805 F.Supp. 1266, 1271–72 [E.D.N.C.1992]; *Edwards v. Bardwell,* 632 F.Supp. 584, 589 [M.D.La.1986] ); *see also United States v. Mathis,* 96 F.3d 1577, 1583 n. 4 (11th Cir.1996) (quoting *Askin* for same proposition). I see no reason not to follow the logic of these other jurisdictions.

Because the Federal Wiretap Act provides no protection for plaintiffs' cordless telephone conversations prior to October 25, 1994, as a matter of law, I cannot find that defendants violated section 1983 during that time period. Accordingly, defendants' motion for summary judgment concerning constitutional violations is granted to the extent that it refers to cordless telephone interceptions prior to October 25, 1994. As explained above, however, defendants' interceptions of conversations occurring on or after October 25, 1994, were impermissible under the amended Federal Wiretap Act. If these later communication interceptions are deemed to have occurred "under color of state law," then I must deny defendants' motion for summary judgment as it regards the Quigleys' intercepted conversations on or after October 25, 1994.

■■ As noted above, section 1983 imposes liability where a deprivation of a right secured by the Constitution or laws occurs "under color of state law." 42 U.S.C.A. § 1983; *Adickes v. S.H. Kress & Co.,* 398 U.S. 144, 150, 90 S.Ct. 1598, 1604, 26 L.Ed.2d 142 (1970). Where the defendant is a private party, the question is whether its "conduct has sufficiently re-

ceived the imprimatur of the State so as to make it 'state' action for purposes of the Fourteenth Amendment." *Blum v. Yaretsky,* 457 U.S. 991, 1004, 102 S.Ct. 2777, 2785, 73 L.Ed.2d 534 (1982); *see also Pino v. E.P. Higgs,* 75 F.3d 1461, 1464 (10th Cir.1996) (noting that "state action necessarily constitutes action under color of state law"). "The ultimate issue in determining whether a [defendant] is subject to suit under [section] 1983 is the same question posed in cases arising under the Fourteenth Amendment: is the alleged infringement of federal rights 'fairly attributable to the state?'" *Rendell–Baker v. Kohn,* 457 U.S. 830, 838, 102 S.Ct. 2764, 2770, 73 L.Ed.2d 418 (1982) (citation omitted). If the defendant did not engage in what is deemed state action, then section 1983 liability is not appropriate. *See id.* at 838, 102 S.Ct. at 2770 (explaining that, if the action of the defendant is not state action, the inquiry into liability ends).

The Tenth Circuit has acknowledged that Supreme Court precedent takes a flexible, fact-specific approach to the state-action doctrine. *Gallagher v. "Neil Young Freedom Concert,"* 49 F.3d 1442, 1447 (10th Cir.1995). *Gallagher* outlines four tests which the Supreme Court has articulated concerning the determination of state action: (1) the nexus test; (2) the symbiotic relationship test; (3) the joint action test; and (4) the public function test. *Id.* at 1448–56. Because I find that the Quigleys have offered sufficient evidence to satisfy the nexus test, I do not apply the other tests to these facts.

■■■■ The party alleging state action must show that "'there is a sufficiently close nexus between the State and the challenged action of the regulated entity so that the action of the latter may be fairly treated as that of the State itself.'" *Blum,* 457 U.S. at 1004, 102 S.Ct. at 2786 (quoting *Jackson v. Metropolitan Edison Co.,* 419 U.S. 345, 351, 95 S.Ct. 449, 453, 42 L.Ed.2d 477 [1974]). The Tenth Circuit has noted that, under the nexus test, the state will be held liable "only if it is responsible for the specific conduct of which the plaintiff complains," and the state does more than offer "[m]ere approval of or acquiescence in the initiatives of a private party...." *Gallagher,* 49 F.3d at 1448 (citations omitted). In addition, a state will generally be held responsible for private conduct "when it has exercised coercive power or has provided such significant encouragement, either overt or covert, that the choice must in law be deemed to be that of the State." *Blum,* 457 U.S. at 1004, 102 S.Ct. at 2785–86.

■■■■ In this case, the Quigleys assert that the Aronsons' private conduct constitutes thinly-veiled state action. Specifically, the Quigleys offer evidence that the Aronsons continued to intercept the Quigleys' phone conversations "on the orders of the Jefferson County District Attorney" despite the fact that Mrs. Aronson was "very concerned that they had to keep taping." (Pls.' Resp. Facts, Attach., Ex. T [Towbin Dep. at 275].) I agree that these facts—which defendants do not counter—suggest the sort of coercion to public action through particularized private conduct which the nexus test addresses. *Cf. Willis v. University Health Servs., Inc.,* 804 F.Supp. 1557, 1559 (S.D.Ga.1992) (finding no sufficient nexus between state in form of county hospital authority and university health service where, *inter alia,* county hospital authority did not coerce or encourage university health service to fire registered nurse). I note, however, that the same witness also states that Mrs. Aronson was "very agitated that the [district attorneys] haven't [sic] pursued—she didn't feel the [district attorneys] were pursuing it very aggressively with the Quigleys...." (*Id.,* Attach., Ex. T [Towbin Dep. at 276].) Certainly, these two remarks create a question of fact as to whether the Aronsons were, in fact, engaging in state action or, rather, were pursuing their own agenda, and merely sought to engage the district attorney's office in their personal pursuits. Given this conflict, a reasonable jury could find that such conduct, to the extent it occurred on or

after October 25, 1994, constituted state action depriving the Quigleys of their civil rights in violation of section 1983.

The Quigleys further contend that, although Aronsons were the particular private actors intercepting and recording the Quigleys' conversations, defendants may be held liable for the Aronsons' conduct on the grounds that defendants and Aronsons were co-conspirators in the attempt to violate the Quigleys' civil rights. Where one co-conspirator acts in violation of section 1983, liability may be imputed to all co-conspirators. *Dixon v. City of Lawton, Okl.,* 898 F.2d 1443, 1449 n. 6 (10th Cir.1990). The existence or nonexistence of a conspiracy is usually a question of fact. *Singer v. Wadman,* 745 F.2d 606, 608 (10th Cir.1984) (citing *Adickes,* 398 U.S. at 176, 90 S.Ct. at 1618 [1970] ). "A civil conspiracy is the combination of two or more persons acting in concert, either to commit an unlawful act, or to commit a lawful act by unlawful means." *Id.* (citation omitted). Defendants here offer no evidence to refute the allegation that they acted in concert with the Aronsons and the district attorney's office in arranging and publicizing the intercepted comments of the Quigleys. The Quigleys, on the other hand, offer evidence that defendants knew information concerning the Aronsons' interception of the messages and their coordination with the district attorney's office, as well as actively participated in the release of information from the recorded conversations at the press conference. (Pls.' Resp. Facts, Attach., Ex. Z [Lozow Dep. at 145].) Thus, even if defendants were not directly responsible for intercepting the Quigleys' phone calls on or after October 25, 1994, they may nonetheless be held liable if it is determined that, in so doing, the Aronsons violated the Quigley's civil rights. Accordingly, defendants' motion for summary judgment concerning constitutional violations is denied to the extent that it refers to conduct occurring

after October 24, 1994; it is granted in all other respects.

### 5. Motion for Summary Judgment: Agency

An agency is a " 'fiduciary relationship which results from the manifestation of consent by one person to another that the other shall act on his behalf and subject to his control, and consent by the other so to act.' " *City & County of Denver v. Fey Concert Co.,* 960 P.2d 657, 660 (Colo.1998) (en banc) (quoting Harold Gill Reuschlein & William A. Gregory, *The Law of Agency and Partnership* § 2 at 4 [2d ed.1990] ). The control a principal exercises over the manner of work performed by an agent is evidence that an agency relation exists. *United States v. Young,* 736 F.2d 565, 567–68 (10th Cir. 1983), *rev'd on other grounds,* 470 U.S. 1, 105 S.Ct. 1038, 84 L.Ed.2d 1 (1985). More specifically, the most important factor in determining whether a person is an agent is the principal's right to control the agent, not the fact of control. *Moses v. Diocese of Colo.,* 863 P.2d 310, 324 (Colo.1993) (en banc) No one factor, however, including control, is determinative. *Dana's Housekeeping v. Butterfield,* 807 P.2d 1218, 1220 (Colo.Ct.App.1990). The existence of an agency relationship is usually a question of fact, although where there are no material facts in dispute, the issue may be determined as a matter of law. *Stortroen v. Beneficial Fin. Co.,* 736 P.2d 391, 395 (Colo.1987).

Defendants contend that, because Kritzer and Lozow were not agents of ADL, their actions may not be imputed to the ADL for purposes of vicarious liability. In particular, defendants urge me to dismiss the Quigleys' claims against the ADL for (1) Federal Wiretap Act violations, (2) malicious prosecution, (3) abuse of process, and (4) intentional interference with prospective employment opportunity.[2] I note

---

**2.** I note that the Quigleys' claims for malicious prosecution and intentional interference with prospective employment opportunities

are also alleged against Rosenthal. (Consolidated Compl. ¶¶ 174–79, 186–89).

at the outset that, although defendants seek dismissal of these claims outright, in several places, defendants' argument is inappropriate to the extent that the Quigleys' factual assertions against ADL are not based exclusively on the conduct of Kritzer or Lozow acting as ADL agents. For instance, one of their claims under the Federal Wiretap Act and their claim for malicious prosecution allege impermissible conduct on the part of both defendants directly and through their agents. (Consolidated Compl. ¶¶ 119, 177–78.) Further, the Quigleys' claim for intentional interference with prospective economic advantage does not even mention Kritzer or Lozow. (*Id.* ¶¶ 187, 189.) Accordingly, to the extent that I find Kritzer and Lozow functioned as ADL agents, I dismiss only the portion of these claims which relies on that relationship for a finding of liability.

Defendants have summarized their relevant factual data with the legal conclusions that neither Lozow nor Kritzer was "acting as an agent of or representing ADL while representing his clients, the Aronsons." (ADL and Rosenthal's Br. in Supp. of Summ.J. re: Claims of Agency, Statement of Undisputed Material Facts ¶¶ 1–2 [filed Aug. 12, 1998] [hereinafter "Defs.' Agency Br."].) While such conclusory statements are insufficient to establish or refute an agency relationship as a matter of law, defendants support these factual assertions with more specific citations to the record. Upon consideration of this cited evidence, I find that Lozow testified that he "didn't discuss in one fashion or another the transcripts" of recorded calls of the Quigleys with Rosenthal, nor was he "talking to the ADL about the heart of this case or [ ] Rosenthal about [his] opinions about the case." (*Id.*, Ex. 1 [Lozow Dep. at 171–72].) Lozow further stated, without defining who constituted "we," that:

> We didn't include the ADL in tactical decisions that were made after a commitment was made to go ahead in the civil case. We didn't include them. We didn't ask for their input. We weren't guided by them, and we didn't tell them

specifically what our legal decisions, what they were grounded upon.

(*Id.*, Ex. 1 [Lozow Dep. at 174].) Finally, Lozow declared that he "didn't consider the ADL to be who [sic][he] was representing." (*Id.*, Ex. 1 [Lozow Dep. at 175].) In a similar vein, Kritzer testified that he told Towbin that "the Aronsons were [his] client, not the ADL." (*Id.*, Ex. 2 [Kritzer Dep. at 193].) Kritzer also stated that, between November 8 and December 6, 1994, he did not communicate with anyone other than attorneys from Lozow's firm concerning the proposed civil lawsuit which the Aronsons would file against the Quigleys. (*Id.*, Ex. 2 [Kritzer Dep. at 193].) Finally, Kritzer states that he was "retained and ... was going to be retained by the Aronsons. [He] was brought into [the case] by [ ] Lozow. The referral didn't come from the ADL. The ADL was not [his] client. [He] wasn't working for the ADL. [He] had no attorney-client relationship with [the ADL]," even though he knew that the ADL was interested in the case and the ADL was present at two meetings about the issue prior to November 8, 1994. (*Id.*, Ex. 2 [Kritzer Dep. at 195].) Contrary to the Quigleys' assertions, (Pls.' Resp. at 3–6), I find these allegations sufficient to satisfy defendants' initial burden of demonstrating that Kritzer and Lozow were not their agents.

After a consideration of the facts which the Quigleys present in their responsive brief, however, I conclude that there are disputed facts which preclude me from granting defendants' motion for summary judgment. Among the facts upon which the Quigleys rely to buttress their argument that Kritzer and Lozow were agents, I find that only the following are both relevant and supported by evidence in the record:

(1) Lozow advised the Aronsons that their illegal interception of the Quigleys' telephone conversations was not an illicit activity. (Pls.' Resp. Facts., Attach., Ex. Z [Lozow Dep. at 141–42] );

(2) Kritzer and Lozow participated in at least one strategy session with the Aronsons and ADL representatives on November 8, 1994, in which they agreed to prepare the Aronsons' civil lawsuit against the Quigleys and to facilitate the criminal prosecution of the Quigleys. (*Id.* Attach., Ex. CC [Kornfeld Dep. at 105–08]);

(3) After signing a representation agreement with the Aronsons in December 1994, Kritzer and Lozow continued to serve defendants' interests over the interests of the Aronsons. That is, although the Aronsons preferred a private resolution of the matter, and Mr. Aronson preferred not to have a press conference, Kritzer and Lozow failed to advise them to that effect, instead cohering with ADL's and Rosenthal's preferences for filing a case before negotiation and holding a public press conference. (*Id.,* Statement of Additional Disputed Facts ¶¶ 78, 80–81, 96–97);

(4) On December 6, 1994, Rosenthal, Kritzer, Andy Silverman (an associate in Kritzer's firm), Towbin, and the Aronsons met to discuss "how the Aronsons wanted to handle the inquiries from the press." (*Id.,* Attach., Ex. T [Towbin Dep. at 305].) At the conclusion of the meeting, it was decided that there would be a press conference the following day to discuss the filing of the complaint, a decision which Rosenthal favored, but Mr. Aronson opposed. (*Id.,* Attach., Ex. M [Mr. Aronson Dep. at 487–89]);

(5) Before the press conference on December 7, 1994, Rosenthal provided Kritzer with a copy of his Opening Statement for Kritzer's editorial input. Kritzer, the Aronsons, Towbin, and perhaps others also discussed Rosenthal's Opening Statement, to be delivered at the press conference on December 7, 1994. (*Id.,* Attach., Ex. T [Towbin Dep. at 369–70]);

(4) When Rosenthal introduced the individuals present at the press conference on December 7, 1994, he noted Kritzer's presence, but did not specify that Kritzer was the Aronsons privately retained counsel and therefore distinguishable from the other press conference participants. (*Id.,* Attach., Ex. MM [Opening Statement]);

(5) Pursuant to a 1998 settlement between Kritzer, Lozow, the Aronsons, and the Quigleys, Kritzer and Lozow agreed to pay a total of $350,000 to the Quigleys and $50,000 to the Aronsons. The ADL, in turn, has provided $50,0000 to Lozow and $5,000 to Kritzer, representing their respective insurance deductibles for legal expenses relating to the Aronson/Quigley litigation. (*Id.,* Attach., Ex. FFF [Letter from Meltzer to Kritzer of 6/10/96], Ex. GGG [Letter from Meltzer to Greengard of 4/22/98].)

Among these alleged facts, I find most persuasive that Kritzer and Lozow participated in meetings with both the Aronsons and ADL representatives on at least two occasions, November 8, 1994, and December 6, 1994.

Although Kritzer and Lozow's conduct and affiliations on some of these occasions are not completely clear, construing the evidence in the light most favorable to the Quigleys, I cannot definitively find that Kritzer and Lozow were not effectively functioning as agents of the ADL and/or Rosenthal. Certainly, there is evidence to contradict Lozow's testimony that ADL was not included in any tactical decision-making, even if some of the decisions were made prior to the formal start of the attorney-client relationship between Kritzer and Lozow and the Aronsons. Further, that the ADL helped to compensate Kritzer and Lozow for losses sustained due to their work with the Aronsons suggests that Kritzer and Lozow may have been serving the ADL's interests as well as, or in conflict with, the Aronsons' interests. Because any conclusion concerning Kritzer and Lozow's agency would require a credibility determination, making such a conclusion is premature at this juncture. In addition, because I deny the motion on this basis, I do not entertain the Quigleys' further arguments that defendants should be

held liable for Kritzer and Lozow's conduct because they were all co-conspirators. (Pls.' Br. at 50–51.) I therefore deny defendants' motion for summary judgment on agency.

### 6. Conclusion

Based on the foregoing, it is therefore

ORDERED as follows:

1. Defendants' motion for reconsideration (# 241–1) is GRANTED. The motion for a protective order (# 241–2) is likewise GRANTED. The oral ruling entered July 23, 1998, is VACATED insofar as it granted plaintiffs' motion to compel production of documents responsive to request no. 6 in plaintiffs' second set of interrogatories and request for documents.

2. Defendants' motion for summary judgment concerning the First Amendment (# 254) is GRANTED in part and DENIED in part.

3. Defendants' motion for summary judgment concerning the First Amendment is GRANTED in part. Because plaintiffs' have failed to produce sufficient evidence that any statements made after December 9, 1994, (the date on which the events in question became a matter of public concern), were made with malice, the defamation claims cannot be based on statements made after that date.

4. Defendants' motion for summary judgment concerning the First Amendment is DENIED in all other respects.

5. Defendants' motion for summary judgment concerning constitutional violations (# 250) is GRANTED in part and DENIED in part.

6. Defendants' motion for summary judgment concerning constitutional violations is GRANTED in part. Upon my determination that the cordless telephone interceptions were not prohibited by the federal wiretap statute prior to October 25, 1994, plaintiffs cannot use such conversations to establish liability under section 1983.

7. Defendants' motion for summary judgment concerning constitutional violations is DENIED in all other respects.

8. Defendants' motion for summary judgment concerning agency (# 252) is DENIED.

9. Plaintiffs' motion to strike and exclude from evidence the expert testimony of Thomas Kelley (# 239) is DENIED.

10. Plaintiffs' motion to strike and exclude from evidence testimony from Levin and Johnston (# 244) is DENIED.

11. Defendants' motion for a protective order regarding the Foxman deposition (# 248) is GRANTED.

12. Plaintiffs' motion to extend time to disclose rebuttal experts (# 260) is GRANTED. Reports from experts designated to rebut the testimony of Kelley, Levin, and Johnston shall be served within thirty days of the date of this order. All depositions of such rebuttal experts (together with depositions of heretofore endorsed experts) shall be concluded within sixty days of the date of this order.

13. Plaintiffs' motion to file certain reply briefs (# 266) is GRANTED.

14. Plaintiffs' motion to designate Patten and/or substitute Patten for Aucone (# 272) is DENIED.

15. Plaintiffs' motion to deviate (# 278) is GRANTED.

16. Plaintiffs' motion to file more paper concerning the Foxman deposition (# 288) is DENIED.

17. Plaintiffs' motion to supplement their opposition to the motion for reconsideration (# 289) is GRANTED.

18. Plaintiffs' motion to conclude the depositions of two specified fact witnesses after the final pretrial conference (# 300) is GRANTED.